## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bristol Borough,               :
             Petitioner    :
                        :   No. 464 C.D. 2018
      v.                  :   Argued: November 14, 2018
                        :
Workers' Compensation Appeal    :
Board (Burnett),          :
             Respondent   :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE ROBERT SIMPSON, Judge
             HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE ELLEN CEISLER, Judge

**OPINION**
**BY JUDGE SIMPSON**           **FILED: March 22, 2019**

## I. Introduction

In this case involving the reporting requirements for a cancer claim by a volunteer firefighter under Sections 108(r) and 301(f) of the Workers' Compensation Act (Act),[1] Bristol Borough (Employer) petitions for review of an order of the Workers' Compensation Appeal Board (Board) that affirmed, as modified, a Workers' Compensation Judge's (WCJ) order granting William Burnett's (Claimant) claim petition and awarding him total disability benefits for a closed period. Section 301(c)(2) of the Act, 77 P.S. §411(2), provides that the term "injury" as used in the Act shall include an "occupational disease" as defined in Section 108 of the Act. The Act of July 7, 2011, P.L. 251 (commonly known as Act

---

[1] Act of June 2, 1915, P.L. 736, as amended, added by the Act of July 27, 2011, P.L. 251, 77 P.S. §§27.1(r), 414, respectively.

46), amended Section 108 to include: "(r) Cancer suffered by a firefighter which is caused by exposure to a known carcinogen which is recognized as a Group 1 carcinogen by the International Agency for Research on Cancer."[2]  77 P.S. §27.1(r). Act 46 also added Section 301(f) of the Act, 77 P.S. §414, which requires that any claim by a member of a volunteer fire company be based on evidence of direct exposure to a carcinogen referred to in Section 108(r) as documented by reports filed pursuant to the Pennsylvania Fire Information Reporting System (PennFIRS).

In the present case, the WCJ determined Claimant met his burden of proving his entitlement to benefits for cancer, which his doctors diagnosed as diffuse large B-cell/Non-Hodgkin's lymphoma (large B-cell NH-lymphoma), under Sections 301(c)(2), 301(f) and 108(r) of the Act.  The WCJ determined that Claimant's medical expert, Dr. Tee L. Guidotti (Dr. Guidotti), credibly opined in his report[3] that Claimant's type of lymphoma arose from his exposure to Group 1 carcinogens in fire smoke, primarily trichloroethylene (TCE), a halogenated alkene compound formed by the reaction of organic material produced by burning and chlorine from sources such as polyvinyl chloride furnishings and products found in structures.

---

[2] The International Agency for Research on Cancer (IARC) is a specialized research group within the World Health Organization that attempts to identify the causes of human cancers.  The IARC evaluates various agents, mixtures, and exposures and classifies them into one of five groups.  Group 1 substances are classified as carcinogenic to humans.  See City of Phila. Fire Dep't v. Workers' Comp. Appeal Bd. (Sladek), 195 A.3d 197, 200 n.4 (Pa. 2018).

[3] Because Claimant's period of disability was less than 52 weeks, the parties agreed to rely on medical reports.

The WCJ also determined that Claimant's incident participation report, based on information compiled from his volunteer fire company's PennFIRS reports, met the PennFIRS reporting requirements in Section 301(f) of the Act. The Board also determined that Claimant's incident participation report met the reporting requirements in Section 301(f).

On appeal, Employer contends: (1) the Board erred by disregarding the plain language of Section 301(f) of the Act, which requires that a volunteer firefighter use only PennFIRS reports to prove exposure to a known Group 1 carcinogen; (2) the WCJ erred in allowing testimony from the Pennsylvania Fire Commissioner regarding the legislative history of Section 301(f)'s requirements regarding the forms of proof for volunteer firefighter claims; (3) the Board erred by failing to require proof that Claimant's specific cancer was directly related to firefighting exposure; and (4) the Board erred in sustaining a subrogation lien that was never properly established by competent admissible evidence. For the reasons that follow, we affirm.

## II. Background
### A. Claim Petition

In September 2015, Claimant filed a claim petition under Section 108(r) of the Act alleging he sustained large B-cell NH-lymphoma as a result of exposure to IARC Group 1 carcinogens while working as a volunteer firefighter for Employer. Claimant sought full indemnity benefits from February 18, 2015, into the future. Claimant's petition indicated he had additional employment. Employer filed a timely answer denying Claimant's material allegations.

3

## B. Evidence

Claimant, 57 years old at the time of his deposition, testified that he is still a member of Goodwill Hose Company No. 3, a volunteer fire company in Bristol Borough. WCJ Op., 10/14/16, Finding of Fact (F.F.) No. 13a. He initially joined the company in 1976, and served as a firefighter, lieutenant, captain, assistant chief, deputy chief, and chief. Id. Regardless of his rank, Claimant would respond to fires and be an active participant in the attack phase, interior firefighting and overhaul. Id. Claimant indicated he fought all types of fires, including houses, warehouses, industrial structures, commercial buildings, and cars. F.F. No. 13e. Claimant estimated he participated in 2,000 responses to incidents during his career. F.F. No. 13p. He responded to his last fire call in January 2015. F.F. No. 13z.

Claimant further testified that since 1979 he began working as a mail carrier for the U.S. Postal Service. F.F. No. 13s. During the 1980s, Claimant also worked as a part-time paid firefighter for Bristol Borough. F.F. No. 13u. He would fill in for absent regular full-time employees. Id.

In February 2015, Claimant's doctors diagnosed him with large B-cell NH-lymphoma. F.F. No. 13w. Claimant began treating with Dr. Lebovic at that time. Id. Claimant received six rounds of chemotherapy and continued his cancer treatment with Dr. Lebovic. F.F. No. 13x.

On August 1, 2015, Claimant returned to work as a mailman without restrictions. F.F. No. 13y. Claimant received the same amount of pay as he did prior to the onset of his disability in February 2015. Id.

4

In support of his claim, Claimant introduced a medical report from Dr. Guidotti, a physician board certified in internal medicine, pulmonary medicine and occupational medicine. F.F. No. 14a. Dr. Guidotti is also a well-recognized expert in toxicology and epidemiology as applied to the problems of occupational and environmental exposure, with particular reference to the occupational health of firefighters. Id.

Dr. Guidotti noted Claimant's 39 years of firefighting. F.F. No. 14b. Claimant became acutely ill with diarrhea in early February 2015. Id. His doctors diagnosed him with large B-cell NH-lymphoma on February 26, 2015. Id.

Dr. Guidotti explained that the IARC recognizes there is an association between large B-cell NH-lymphoma and the occupation of firefighter. F.F. No. 14e. In particular, Dr. Guidotti concluded that scientific studies establish there is a causal relationship between firefighting and large B-cell NH-lymphoma. Id.

Dr. Guidotti further stated that the IARC concluded, based upon medical and scientific studies, that firefighters have an elevated risk, "up to doubling," for developing large B-cell NH-lymphoma. F.F. No. 14f. Dr. Guidotti noted there is strong evidence showing that large B-cell NH-lymphoma is associated with carcinogenic exposures known to occur during firefighting. F.F. No. 14h. TCE is a halogenated alkene compound formed by the reaction of organic material produced by burning and chlorine from sources such as polyvinyl chloride furnishings and products found in structures. TCE, often present in smoke at structure fires, has been specifically associated with several types of large B-cell

5

NH-lymphoma. Id. Dr. Guidotti stated the present "state of the art," as indicated by the pertinent medical and scientific studies, is that the weight of the evidence favors the conclusion that constituents of fire smoke, particularly TCE, are associated with elevated risk of large B-cell NH-lymphoma. Id.

Consequently, Dr. Guidotti opined within a reasonable degree of medical certainty that Claimant's cancer, a specific form of NH-lymphoma, arose out of his occupation as a firefighter. F.F. No. 14i. To that end, the doctor noted Claimant had no other risk factors for large B-cell NH-lymphoma. Id.

Claimant also introduced the deposition testimony of Pennsylvania Fire Commissioner Edward Mann (Fire Commissioner). Fire Commissioner testified the Governor appointed him to his post in 2000. F.F. No. 15a. Fire Commissioner has been involved in the fire service since he first joined a local volunteer fire department in 1977. Id. He also served in the U.S. Air Force as a fire protection specialist for 17 years and remained active in the fire service wherever he was stationed. Id.

As part of his responsibilities, Fire Commissioner serves as liaison between the fire service, the Governor's Office, and the General Assembly. F.F. No. 15b. Fire Commissioner is familiar with PennFIRS. F.F. No. 15c. The purpose of PennFIRS, which he described as Pennsylvania's version of the National Fire Reporting System (NFIRS), is to collect data related to the cause of fires, fire damage, and the injuries to civilians and firefighters. Id.

6

As part of PennFIRS, there is a report completed by a volunteer fire company or the fire company that responds to an incident or event. F.F. No. 15d. However, the report contains no evaluation of the carcinogens found at a particular fire scene. F.F. No. 15e.

Fire Commissioner further testified that he is familiar with the occupational cancer literature from the IARC, the National Fire Protection Agency, and other groups concerning the hazards of firefighters' exposure to smoke. F.F. No. 15g. According to the literature, one of the hazards of firefighting is exposure to carcinogens. Id.

Our review of Fire Commissioner's deposition reveals he testified "there is no place on the PennFIRS reports for PennFIRS to log or catalog the carcinogens a particular firefighter would be exposed to fighting fires."[4] Dep. of Fire Commissioner Edward Mann (Mann Dep.), 4/22/14, at 14; R.R. at 361a (emphasis added). Fire Commissioner further testified there is no place in the PennFIRS reports to document the carcinogens a firefighter would be exposed to from smoke during the overhaul stage at a fire scene or from diesel exhaust. F.F. No. 15g. Summarizing, Fire Commissioner testified the PennFIRS reports contain no information specifically identifying the carcinogens to which any volunteer firefighter in Pennsylvania was exposed during his career. F.F. No. 14h.

---

[4] We recognize the WCJ stated that Fire Commissioner "affirmed there is place [sic] on the PennFIRS reports for PennFIRS to log or catalog the carcinogens a particular firefighter would be exposed to fighting fires." WCJ Op., 10/14/16, Finding of Fact No. 15g. However, given the WCJ's further findings to the contrary, we construe this to be a typographical error or omission.

7

On cross-examination, Fire Commissioner indicated he is familiar with the language of Section 108(r) as it is documented by reports filed under PennFIRS. F.F. No. 15i. Fire Commissioner further testified that the purpose of the reporting language in Act 46 was to ensure that a firefighter making a cancer claim could prove that he actually attended the fire. F.F. No. 15j.

In addition, the Commissioner explained on cross-examination that the only practical way to log exposure to specific carcinogens at the scene of a fire would be to put air monitoring equipment into the burning building, gather all the particulates from the atmosphere, and ship them to a chemist for analysis. F.F. No. 15k. A review of the chemist's report would reveal the type and amount of carcinogen present in the building. Id. Fire Commissioner opined that although this could be done, it would be absolutely impractical and cost prohibitive. Id.

### C. WCJ's Decision

Reviewing the evidence, the WCJ found Claimant's testimony to be competent and persuasive, and he credited it in its entirety. F.F. No. 28. The WCJ found that Claimant established he engaged in firefighting activities for more than four years and that prior to his diagnosis of large B-cell NH-lymphoma, he did not show any signs of cancer. Id. Claimant's testimony established his exposure as a firefighter to IARC Group 1 carcinogens in fire smoke, soot, diesel exhaust and contaminated gear. Id. Claimant first learned of the relationship between these exposures and cancer when he reviewed Dr. Guidotti's report in September 2015. Id.

8

The WCJ also found that Claimant's credibility was supported by Fire Commissioner's testimony and documentation from Claimant's volunteer fire company showing that it participates in PennFIRS. Id. The WCJ further found that Claimant's testimony supports the medical opinions of his expert, Dr. Guidotti. Id.

In addition, the WCJ not only credited, but afforded great weight to, Fire Commissioner's testimony in its entirety. F.F. No. 30. In particular, the WCJ accepted Fire Commissioner's testimony regarding: the purpose of the PennFIRS reporting requirements in Act 46; the fact that firefighters are exposed to carcinogens in the fire service, and the fact that exposures to carcinogens are not monitored at the fire scenes as part of either PennFIRS or NFIRS. Id.

With respect to the medical evidence, the WCJ accepted Dr. Guidotti's report as more credible than the report of Employer's medical expert, Dr. Howard M. Sandler (Dr. Sandler). F.F. No. 32. In particular, the WCJ rejected Dr. Sandler's opinion that there was no reliable, scientifically derived evidence that Claimant's time spent as a volunteer firefighter caused him to sustain exposure of any nature that had an impact on the development of his large B-cell NH-lymphoma. Id.

To the contrary, the WCJ accepted Dr. Guidotti's opinion, expressed within a reasonable degree of medical certainty, that Claimant's cancer arose out of his service as a firefighter and that the exposures associated with his service strongly contributed to the risk of his cancer. Id. Dr. Guidotti, based on his review of the pertinent scientific and medical literature, opined that the current "state of the art" is that the weight of the evidence favors a conclusion that elements of fire smoke,

9

particularly TCE, are associated with an elevated risk of large B-cell NH-lymphoma. Id. More specifically, Dr. Guidotti stated that there is scientific evidence of an elevation in the risk of NH-lymphoma in general among firefighters, and that there is strong collateral evidence that the risk of large B-cell NH-lymphoma is particularly elevated. Id. This collateral evidence specifically suggests that the cause within firefighting is exposure to halogenated alkenes and likely other carcinogens. Id.

Based on the evidence presented, the WCJ determined that Claimant's large B-cell NH-lymphoma was covered under Section 108(r) of the Act, and that he was entitled to a presumption of compensability under Section 301(f) of the Act. F.F. No. 33a. The WCJ found that Claimant sustained direct exposure to Group 1 carcinogens related to large B-cell NH-lymphoma in fire smoke, soot, diesel engine exhaust and contaminated gear during 39 years of service as a firefighter. F.F. No. 33c. The WCJ further found that Employer's PennFIRS reports properly documented Claimant's fire service. Id.

As a result of his work-related cancer, Claimant suffered a complete loss of earnings beginning in February 2015 and continuing through July 31, 2015. F.F. No. 35. Claimant returned to work without restrictions on August 1, 2015. Id.

Accordingly, the WCJ granted Claimant's claim petition and awarded him total indemnity benefits beginning February 26, 2015, continuing through July 31, 2015, at which time Claimant's indemnity benefits were suspended. WCJ Order, 10/14/16. The WCJ also awarded Claimant 10% interest on all deferred and unpaid

10

compensation. Id. In addition, the WCJ ordered Employer to pay a medical services lien in the amount of $78,104 in favor of Independence Blue Cross (Highmark). Id.

### D. Board Decision

In its appeal to the Board, Employer argued the WCJ erred in determining that Claimant met his burden of proving direct exposure to Group 1 carcinogens by documentation filed under PennFIRS. Specifically, Employer asserted Claimant submitted no relevant PennFIRS reports into the record.

Citing our decision in Steele v. Workers' Compensation Appeal Board (Findlay Township), 155 A.3d 1173 (Pa. Cmwlth. 2017), the Board recognized that PennFIRS documentation is required for Claimant to meet his burden of proof. However, in Steele, the claimant did not submit *any* reports into the record. Consequently, the Court did not address what information PennFIRS reports must establish.

The Board further determined that nothing in the language of the Act precludes the use of expert testimony to establish a firefighter's exposure to Group 1 carcinogens. Thus, the Board reasoned that once a volunteer firefighter establishes his continuous service of four or more years of firefighting duties, he may satisfy his burden of establishing exposure to Group 1 carcinogens in the same manner as a career firefighter – through expert scientific evidence. See Bd. Op., 3/6/18, at 10.

Here, the Board noted the WCJ found that Claimant used PennFIRS documentation establishing his fire service. Id. This documentation consisted of an

11

incident participation report. See WCJ Hr'g, Notes of Testimony (N.T.), 3/30/16, Ex. C-4; Reproduced Record (R.R.) at 293a-346a. Claimant's counsel identified this document as a report pulled from the PennFIRS computerized system. N.T., 3/30/16 at 12; R.R. at 94a. The Board further observed that Employer did not object to Claimant's assertion that the report is a PennFIRS document. Bd. Op. at 10.

The Board recognized that Claimant's reports detailed the number and type of incidents to which he responded. Id. at 11. From January 2003 through December 2014, Claimant responded to 380 incidents. Id. Claimant participated in grass fires, building and structure fires, trash and rubbish fires, cooking and chimney fires, and other types of fires including an incident involving a chemical reaction. Id. The Board determined Claimant's incident participation report met the PennFIRS requirement. Id.

The Board rejected Employer's argument that Claimant should have submitted a separate PennFIRS document for every single incident that detailed what possible carcinogens he was exposed to at the scene. Id. In particular, the Board cited the Fire Commissioner's testimony that there is no place in a PennFIRS document or in the software to log in the carcinogens a firefighter encountered when fighting a fire. Id. More significantly, the Board noted the Fire Commissioner's testimony that it would be too cumbersome, costly and impractical to add this requirement to PennFIRS reports. Id.

The Board further observed that Dr. Guidotti's report credibly established that the IARC recognized Claimant's specific type of cancer as being

12

caused by exposure to Group 1 carcinogens while firefighting.  Id.  Dr. Guidotti's report further established that Claimant's direct exposure to Group 1 carcinogens while firefighting actually caused his large B-cell NH-lymphoma.  Id. at 11-12.

Summarizing, the Board determined that Claimant's submission of PennFIRS documentation regarding his service as a volunteer firefighter, together with Dr. Guidotti's testimony that direct exposure to Group 1 carcinogens while firefighting caused Claimant's large B-cell NH-lymphoma, met Claimant's burden of proof for establishing a compensable cancer claim under Section 108(r) of the Act.  Bd. Op. at 12.

In addition, the Board rejected Employer's contention that the WCJ erred in finding that Trover Solutions[5] (Trover)/Highmark was entitled to subrogation in the amount of $78,104 given the lack of evidence of an enforceable lien.  In so doing, the Board noted that the WCJ accepted testimony that Independence Blue Cross (Independence BC) asserted a lien.  Id.  The WCJ also found that Independence BC preserved its lien and was entitled to subrogation under the Act in the amount of $78,104.  Id.

However, the Board noted the WCJ erroneously named Independence BC rather than Highmark as the entity entitled to subrogation.  Id.  Nonetheless, the Board considered the WCJ's mistake to be a mere typographical error and corrected it.  Id. at 13.

---

[5] Trover Solutions, formerly Healthcare Recoveries, Inc., provides subrogation and workers' compensation recovery services to healthcare insurers across the country.  WCJ's Op., Finding of Fact No. 27a.

As a final note, the Board determined that Trover/Highmark presented substantial, competent evidence supporting the WCJ's finding that Highmark was entitled to the subrogation lien. Id. Trover/Highmark submitted a letter asserting a lien of $78,104, which the WCJ found to be recoverable. Id. Trover/Highmark also submitted a consolidated statement of benefits indicating Highmark paid $78,104 on Claimant's behalf for his cancer treatment from March 10, 2015, to October 20, 2015. Id. Employer petitions for review.[6]

### E. Supreme Court Decision in Sladek

On appeal here, Employer relies significantly on our decision in City of Philadelphia Fire Department v. Workers' Compensation Appeal Board (Sladek), 144 A.3d 1011 (Pa. Cmwlth. 2018), rev'd, 195 A.3d 197 (Pa. 2018), where we held that the claimant could not recover benefits under Section 108(r) because he failed to prove his malignant melanoma was a type of cancer caused by exposure to a Group 1 carcinogen.

In Sladek, a case of first impression, the Board interpreted Section 108(r) of the Act broadly and reasoned that the General Assembly established a causal relationship between any Group 1 carcinogen and any cancer. Reading

---

[6] Our review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. Phoenixville Hosp. v. Workers' Comp. Appeal Bd. (Shoap), 81 A.3d 830 (Pa. 2013).

Section 108(r) in conjunction with Section 301(e),[7] the Board determined that the claimant need not prove he was exposed to a particular Group 1 carcinogen or that the carcinogens to which he was exposed specifically caused his melanoma.

In reversing the Board on appeal, we reasoned that the "caused by" language in Section 108(r) of the Act cannot be simply disregarded. To that end, we determined that the claimant bore the burden of establishing that his malignant melanoma was a type of cancer caused by the Group 1 carcinogens to which he was exposed in the workplace. See Sladek, 144 A.3d at 1021-22.

In October 2018, well after parties filed their respective briefs in this appeal, the Supreme Court handed down its decision in Sladek. See City of Phila. Fire Dep't v. Workers' Comp Appeal Bd. (Sladek), 195 A.3d 197 (Pa. 2018). In a plurality decision reversing this Court, the Supreme Court first addressed the causation requirement in Section 108(r) of the Act. In interpreting the language of Section 108(r), the Court stated (with emphasis by underline added):

> The express language of Section 108(r), namely that the claimant has a 'cancer … which is caused by exposure to a known (Group 1) carcinogen' clearly imposes an initial burden of causation on the claimant. Importantly, however, the provision only requires the claimant to

---

[7] Section 301(e) of the Act, 77 P.S. §413, which applies to occupational diseases generally, provides (with emphasis added):

> If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be presumed that the employe's occupational disease arose out of and in the course of his employment, but this presumption shall not be conclusive.

15

establish a general causal link between the claimant's type of cancer and a Group 1 carcinogen. In other words, the claimant must produce evidence that it is **possible** that the carcinogen in question caused the type of cancer with which the claimant is afflicted. It does not require the claimant to prove that the identified Group 1 carcinogen **actually** caused claimant's cancer. Section 108(r) embodies a legislative acknowledgement that firefighting is a dangerous occupation that routinely exposes firefighters to Group 1 carcinogens that are known to cause various types of cancers. The 'general causation' requirement under Section 108(r) constitutes a recognition that different types of cancers have different etiologies and it weeds out claims for compensation for cancers with no known link to Group 1 carcinogens. The burden imposed by Section 108(r) is not a heavy burden.

In this regard, epidemiological evidence is clearly relevant and useful in demonstrating general causation. Epidemiology deals with, inter alia, the identification of potentially causative associations in various populations between possible causative agents and the resulting incidence of particular diseases and seeks to generalize those results. In so doing, epidemiology may provide 'useful information as to whether there is a relationship between an agent and a disease and, when properly interpreted, can provide insight into whether the agent can cause the disease.' See, e.g., Blum by Blum v. Merrell Dow Pharm., Inc., 705 A.2d 1314 1323-24 (Pa. Super. 1997), aff'd sub nom. Blum ex rel. Blum v. Merrell Dow Pharm., Inc., [764 A.2d 1 (Pa. 2000)] and abrogated on other grounds by Trach v. Fellin, 817 A.2d 1102 (Pa. Super. 2003). Given its focus on identifying generalized causal relationships between potential causative agents and the resulting incidence of disease, epidemiology's focus on statistical analysis may be uniquely suited to illuminate whether there is a general causal relationship between types of cancer and Group 1 carcinogens.

Sladek, 195 A.3d at 208-09 (footnotes omitted).

16

The Supreme Court also examined the standard of proof required to rebut the presumption of compensability in Section 301(f) of the Act. Section 301(f) provides (with emphasis added):

Compensation pursuant to cancer suffered by a firefighter shall only be to those firefighters who have served four or more years in continuous firefighting duties, who can establish direct exposure to a carcinogen referred to in section 108(r) relating to cancer by a firefighter and have successfully passed a physical examination prior to asserting a claim under this subsection or prior to engaging in firefighting duties and the examination failed to reveal any evidence of the condition of cancer. The presumption of this subsection may be rebutted by substantial competent evidence that shows that the firefighter's cancer was not caused by the occupation of firefighting. Any claim made by a member of a volunteer firefighting company shall be based on evidence of direct exposure to a carcinogen referred to in section 108(r) as documented by reports filed pursuant to [PennFIRS] and provided that the member's claim is based on direct exposure to a carcinogen referred to in section 108(r). …

77 P.S. §414.

Reviewing the language in Section 301(f), the Court stated (with emphasis by underline added):

While epidemiological evidence supports the burden of establishing general causation, where the claimant has established an entitlement to the evidentiary presumption of compensability under Section 301(f), such epidemiological evidence is not sufficient to rebut the presumption. As the language of Section 301(f) plainly provides, the evidence required to rebut this presumption must show that 'the firefighter's cancer was not caused by the occupation of firefighting.' 77 P.S. §414. The phrase the 'firefighter's cancer' refers to the claimant's cancer,

17

and thus requires the employer to sustain its burden of proof by demonstrating (1) the specific causative agent of claimant's cancer, and (2) exposure to that causative agent did not occur as a result of his or her employment as a firefighter. In other words, the language of Section 301(f) requires the employer to produce a medical opinion regarding the specific, non-firefighting related cause of claimant's cancer.

The nature of the evidence necessary to establish an 'occupational disease' under Section 108(r) of the Act differs markedly from the nature of the evidence that an employer must present to rebut the evidentiary presumption of employment-related causation. Unlike the proof required under Section 108(r), the employer may not rebut the evidentiary presumption with generalized epidemiological evidence that claimant has a type of cancer that may (or may not) possibly be caused by a Group 1 carcinogen. As indicated, epidemiological studies merely identify statistical associations between disease and potentially causative agents in broad populations, and thus do not provide any evidence demonstrating the specific cause of a particular claimant's cancer. To reach the stage of the proceedings at which the employer attempts to rebut the presumption of employment-related causation, the claimant has already carried his or her Section 108(r) burden of proof that his or her cancer is a type that may be caused by a Group 1 carcinogen. The employer may not rebut the evidentiary presumption merely by revisiting this determination and challenging its accuracy. At the rebuttal stage, the issue relates not to 'types of cancer' relative to potential carcinogens, but rather requires proof of [sic] that the cancer from which the claimant suffers was not caused by his occupation as a firefighter.

Sladek, 195 A.3d at 209-10 (emphasis added).

In Sladek, the Supreme Court noted both the claimant and the employer presented epidemiological evidence regarding causation. The Court reasoned that

18

the parties' epidemiological evidence may be outcome determinative on remand only as to the issue of whether the claimant can carry his evidentiary burden of proof to establish an occupational disease under Section 108(r). Id. at 210. However, if the claimant met his initial burden of general causation under Section 108(r), the employer's epidemiological evidence "would be insufficient to rebut the evidentiary presumption." Id.

Mindful of the Supreme Court's decision in Sladek, we address the merits of Employer's petition for review.

### III. Discussion
### A. PennFIRS Reporting Requirements
### 1. Argument
### a. Interpretation of Section 301(f)

Employer first contends the Board erred as a matter of law by disregarding the plain language of 301(f) of the Act, which requires that a volunteer firefighter use only PennFIRS reports to establish direct exposure to a known Group 1 carcinogen. Employer asserts Section 301(f) specifically differentiates between volunteer firefighters such as Claimant and career professional firefighters for several important reasons, including the fact that certain members of volunteer departments may engage solely in non-firefighting activities such as traffic control or social/fundraising events. Another distinction, Employer argues, is based on the much greater number of responses by career firefighters in an urban setting to structure fires. For example, in the present case, Claimant responded to a rough average of only four structure fires per year.

19

In short, Employer contends Section 301(f) requires that a volunteer firefighter seeking compensation for a cancer claim under Section 108(r) produce concrete evidence of direct exposure to a known Group 1 carcinogen and that the exclusive method of proving such exposure is documentation in PennFIRS reports.

Citing our decision in Steele, Employer asserts the PennFIRS requirement cannot be brushed aside or satisfied by mere evidence that a volunteer firefighter responded to fires. In Steele, we recognized that the language of Section 301(f) clearly requires that volunteer firefighters provide evidence of direct exposure to carcinogens as documented by PennFIRS reports. Consequently, we determined that lay testimony from the claimant and two firefighters regarding the decedent's exposure to carcinogens did not satisfy that requirement.

In Steele, we also noted the principle of statutory construction stating that when the words of a statute are clear and free from all ambiguity, the letter of law may not be disregarded under the pretext of pursuing its spirit. 1 Pa. C.S. §1921(b). Nonetheless, we recognized that the Board augmented its discussion of the plain language of Section 301(f) by reviewing the legislative history of Act 46. Reviewing the changes made to the original bill previously vetoed by the Governor and the comments of the bill's sponsor, we noted that the legislative history of Act 46 confirmed an intent to treat volunteer firefighters differently from career firefighters. In particular, we observed that in cases where the amount of actual exposure of the volunteer firefighter is disputed, the conflict is to be resolved by objective, documentary evidence of exposure to carcinogens in the form of PennFIRS reports. In Steele, we concluded that the Board correctly determined the

20

claimant did not and could not establish her late husband's direct exposure to Group 1 carcinogens through lay witness testimony.

Here, Employer asserts, when confronted with the identical issue, the Board disregarded the holding in Steele and declared that the language of the Act does not preclude the use of expert testimony to establish exposure to a Group 1 carcinogen. Reasoning that Steele did not address the issue of what information needed to be included in a PennFIRS report, the Board decided that if a claimant could establish his presence at fire scenes through PennFIRS reports, testify as to the smoke and other substances encountered at the fire scenes, and then get an expert to opine that his cancer resulted from exposures to carcinogens at those fire scenes, the claimant met the requirements in Section 301(f).

Employer argues the Board's decision is nothing more than an acknowledgement that applying the clear and unambiguous language in Section 301(f) would have resulted in a denial of Claimant's claim, a result which the Board was unwilling to endorse. Employer asserts that if the legislature intended for a claimant to prove Group 1 exposures by medical and scientific testimony, it would have so directed. Similarly, if the legislature intended for PennFIRS reports to only show presence at fire scenes, it would have so stated. Rather, Employer maintains that by mandating the use of PennFIRS reports as the only acceptable proof of exposure to Group 1 carcinogens, the legislature did in fact prohibit any other means of proving such exposures.

Here, Employer asserts, Claimant did not submit a single PennFIRS report. Rather, Claimant submitted a log sheet noting the calls to which he responded. However, the log sheet did not indicate the duration of any call or the role Claimant filled on the call. Most importantly, Employer argues, the log sheet did not indicate whether Claimant experienced any exposure, let alone a direct exposure, to a Group 1 carcinogen. In sum, Employer alleges Claimant's log sheet may have been sufficient to show his mere presence at a fire call, but that is not the standard imposed by Section 301(f). Rather, Employer asserts, the applicable standard requires that designation of exposure to Group 1 carcinogens must appear in a PennFIRS report.

**b. Fire Commissioner's Testimony**

Employer also contends the WCJ erred in allowing Fire Commissioner to testify regarding the legislative history of Act 46 and the wisdom of the General Assembly's decision to require a different form of proof for volunteer firefighter claims as opposed to career firefighter claims. Employer asserts Claimant presented Fire Commissioner's lay testimony in the hope of circumventing the PennFIRS reporting requirement.

More particularly, Employer argues Fire Commissioner's testimony that the intent of the PennFIRS reporting requirement was not to report carcinogens encountered by firefighters was in direct conflict with comments from the sponsor of Act 46.

22

Before the House of Representatives on the third consideration of HB 797, when asked by another Representative why the use of PennFIRS was being proposed, and how the volunteer fire companies will use it, State Representative Frank A. Farry, the sponsor of the legislation, stated:

> PennFIRS is the State fire reporting system, which has been in place for approximately 8 years. During the negotiations regarding this bill, it was determined there needed to be a method by which volunteer firefighters can file a claim under the rebuttable presumption provision. <u>Because this standard provided for career firefighters could not be applied to volunteers, it was determined the utilization of the PennFIRS system would serve to document that the volunteer firefighter was present at an incident where a known carcinogen was present. Mr. Speaker, my legislation provides a standard for volunteer firefighters and departments to document as potential evidence that the volunteer firefighter was directly engaged in firefighting duties at an incident where a known carcinogen was documented to be present and the volunteer firefighter was directly exposed to a class 1 carcinogen</u>.
>
> <u>Mr. Speaker, HB 797 provides a built-in incentive for volunteer fire companies to utilize the PennFIRS system and will push for them to provide thorough information when filling out their PennFIRS reports</u>. The majority of stakeholders in this legislation – local governments, the insurance industry, and the fire service – have all agreed to work together to develop best practices for <u>documenting exposures</u>, and we all hope to develop risk management strategies to reduce exposures and ultimately lower the number of cases of cancer. PennFIRS is the frontline tool to document these incidents.

Pa. Legis. Journal – House, June 21, 2011 at 1338 (emphasis added).

Employer notes Fire Commissioner's testimony that the intent of the PennFIRS reporting requirement is not to document the specific carcinogens encountered by firefighters, and that there is currently no standard operating procedure used to measure carcinogens at fires. However, Employer points out Fire Commissioner never suggested to the General Assembly or anyone else that the PennFIRS reporting requirements be removed from the bill. Furthermore, Fire Commissioner acknowledged there are places on the PennFIRS form to report exposure to diesel fuel emissions, asbestos, toxic gases and other hazardous materials.

Summarizing, Employer alleges Fire Commissioner's lay testimony as to legislative intent behind Act 46 was merely his opinion and is not competent evidence. Fire Commissioner admitted he was not privy to the legislative formulation or discussion of HB 797, which became Act 46 during Governor Tom Corbett's administration. See Mann Dep. at 22-23; R.R. at 369a-70a. Therefore, Employer maintains that Fire Commissioner's testimony as to the legislative intent for including the PennFIRS reporting requirements in Act 46 should not have formed the basis of any of the WCJ's Findings of Fact.

## 2. Analysis
### a. Interpretation of Section 301(f)

To begin our analysis, we note that a firefighter-claimant asserting a cancer claim under Section 108(r) of the Act, 77 P.S. §27.1(r), must first establish that he was diagnosed with a type of cancer possibly caused by one or more IARC Group 1 carcinogens. Sladek. This general causation requirement does not impose

24

a heavy burden on a claimant.  Id.  To that end, our Supreme Court recognized that Section 108(r) embodies a legislative acknowledgement that firefighting is a dangerous occupation that routinely exposes firefighters to Group 1 carcinogens.  Id.

Section 301(f) then provides an evidentiary presumption of entitlement to compensation for a claimant who can show he: (1) served four or more years in continuous firefighting duties; (2) had direct exposure to a Group 1 carcinogen; and (3) passed a physical examination prior to asserting a claim or prior to engaging in firefighter duties after undergoing a physical examination that revealed no evidence of cancer.  77 P.S. §414.

Thereafter, Section 301(f) imposes an additional requirement on volunteer firefighters.  As discussed above, Section 301(f) provides in pertinent part that any claim made by a member of a volunteer firefighting company "shall be based on evidence of direct exposure to a carcinogen referred to in [S]ection 108(r) as documented by reports filed pursuant to [PennFIRS] and provided that the member's claim is based on direct exposure to a carcinogen referred to in Section 108(r)."  77 P.S. §414 (emphasis added).

The crux of Employer's argument is that Section 301(f) requires that a volunteer firefighter use *only* PennFIRS documentation to establish direct exposure to a Group 1 carcinogen by documenting not only his presence at an incident, but also the carcinogen or carcinogens he encountered at the incident.  In light of the Supreme Court's decision in Sladek, this is an overly restrictive interpretation of the

25

language in Section 301(f), which would lead to a result that would be unreasonable and essentially impossible to execute.

Initially, we note, nothing in the language of Section 301(f) explicitly requires volunteer fire companies to identify and document the specific Group 1 carcinogens encountered at a fire incident in PennFIRS reports in order for the evidentiary presumption of compensability to apply to their volunteer firefighters. When the words of a statute are not explicit, the intention of the General Assembly may be determined by considering, among other things, the object to be obtained, the consequences of a particular interpretation, and the contemporaneous legislative history. 1 Pa. C.S. §1921(c)(4), (6), (7).

In Steele, we reviewed the legislative history of Act 46. We noted that the sponsor of the legislation, Representative Farry, explained that "utilization of the PennFIRS system would serve to document that a volunteer firefighter was present at an incident where a known carcinogen was present." See Pa. Legis. Journal – House, June 21, 2011 at 1338 (emphasis added). To that extent, we observed that the legislative history of Act 46 confirmed its intent to treat volunteer firefighters differently than career firefighters. Steele. In Steele, the parties disputed the actual exposure of the volunteer firefighter. Id.

However, contrary to Employer's assertion, our decision in Steele does not support an interpretation of Section 301(f) that would require all volunteer fire companies in Pennsylvania to identify and document the Group 1 carcinogens present at every incident. Rather, we held that in light of the PennFIRS requirement,

the claimant, the wife of a deceased firefighter, could not establish his direct exposure to Group 1 carcinogens merely by using lay testimony absent any documentation of his presence at an incident where Group 1 carcinogens were present. See Steele, 155 A.3d at 1178.

In reviewing the language of Section 301(f), we recognize that it imposes the same general causation requirement on both career and voluntary firefighters to establish "direct exposure to a carcinogen referred to in [S]ection 108(r)." 77 P.S. §414. Notably, Section 301(f) does not require career firefighters to identify and document the carcinogens encountered at every incident. Rather, a career firefighter may establish direct exposure to a Group 1 carcinogen by evidence of his occupational exposure to fire smoke, soot, diesel exhaust, and other hazardous substances such as asbestos, and expert medical/scientific evidence identifying the Group 1 carcinogens present in those substances. See, e.g., Caffey v. Workers' Comp. Appeal Bd. (City of Philadelphia), 185 A.3d 437 (Pa. Cmwlth. 2018) (career firefighter's testimony of occupational exposure to fire smoke, soot and diesel exhaust, combined with expert medical testimony as to causal relationship between bladder cancer and firefighting exposures to these substances, could support an award of medical benefits under Sections 108(r) and 301(f) of the Act).

It would be unreasonable to interpret the identical language in Section 301(f), which specifically applies to Pennsylvania's volunteer fire companies, as imposing a more technical and difficult reporting standard than that required for career fire departments. Common sense dictates that there are many volunteer fire companies across the Commonwealth that lack the resources that would be needed

for the scientific identification and documentation of the Group 1 carcinogens encountered by their firefighters at each incident.

We stress that the Supreme Court interpreted Section 108(r) as embodying "a legislative acknowledgement that firefighting is a dangerous occupation that routinely exposes firefighters to Group 1 carcinogens that are known to cause various types of cancers." Sladek, 195 A.3d 208 (emphasis added). Essentially, the purpose of the causation requirement in Section 108(r) is to weed out claims for compensation "for cancers with no known link to Group 1 carcinogens." Id. (emphasis added).

Thus, in accord with our Supreme Court's recent interpretation in Sladek of the respective evidentiary burdens imposed by Sections 108(r) and 301(f) of the Act, combined with the credible evidence presented in this case, we do not interpret the reporting requirements in Section 301(f) as imposing such a disparate and difficult burden on Pennsylvania's volunteer fire companies as that asserted by Employer. To that end, we recognize Fire Commissioner's credible testimony regarding the impracticability of requiring volunteer fire companies to document each firefighter's exposure to the specific Group 1 carcinogens encountered at each fire event.

Rather, viewing the record in this case in its entirety, and in accord with Sladek, we are convinced that the only reasonable and practicable interpretation of the PennFIRS reporting requirement in Section 301(f) is to document a volunteer firefighter's presence at a type of fire where firefighters are routinely exposed to

28

Group 1 carcinogens known to cause various types of cancers. Sladek. Such an interpretation gives proper effect to all the provisions in Section 301(f) without imposing a requirement on a volunteer firefighter-claimant that is unreasonable, impracticable and, for all intents and purposes, impossible of execution.

Here, Claimant's Exhibit C-04 (Report From Goodwill Hose Company No. 3 and Fire Responses 2001-20), referred to as Claimant's incident participation report, R.R. at 293a-346a, details Claimant's participation in responses to incidents as a volunteer firefighter with Goodwill Hose Company. The report describes the type of incident (such as cooking fire, electrical, building fire, false alarm). The report also denotes Claimant's participation at that incident with an asterisk. In introducing Exhibit C-04, Claimant's counsel stated that the information in the report was pulled from PennFIRS documentation. N.T., 3/30/16 at 12; R.R. at 94a. The report documents Claimant's participation in fire responses between January 1, 2003 and December 31, 2014. Id.

Because Claimant's incident participation report was compiled using PennFIRS data entered into the PennFIRS computerized system by his volunteer fire company, we hold that Claimant satisfied the PennFIRS reporting requirement in Section 301(f) of the Act. Claimant's report denotes his participation in incidents involving exposure to fire smoke likely to contain TCE and other Group 1 carcinogens causally related to the development of large B-cell NH-lymphoma. This is sufficient to satisfy the PennFIRS reporting requirements in Section 301(f). Consequently, we reject Employer's contention that Section 301(f) required

Claimant to print out the actual PennFIRS reports entered by his volunteer fire company over the course of his fire service.

### b. Fire Commissioner's Testimony

Essentially, Employer contends Fire Commissioner's lay testimony was not competent evidence of the legislative intent for including the PennFIRS reporting requirements in Section 301(f) and therefore cannot support the WCJ's findings. We disagree.

In order to test whether the evidence relied upon constitutes substantial evidence in support of a finding, a reviewing court must determine whether the evidence admitted is competent, and, if so, whether the evidence is sufficient to support the administrative finding. Gibson v. Workers' Comp. Appeal Bd. (Armco Stainless & Alloy Prod.), 861 A.2d 938 (Pa. Cmwlth. 2004). When the evidence is competent and sufficient, the finding is supported by substantial evidence. Id.

Generally, issues concerning the admission and exclusion of evidence fall within the sound discretion of the administrative tribunal and will not be reversed on appeal absent a finding of an abuse of discretion. Gibson (citing Morrison v. Dep't of Pub. Welfare, Office of Mental Health, 646 A.2d 565 (Pa. 1994)). Nevertheless, we recognize the fundamental rule of law that witnesses must have first-hand knowledge of the subject on which they are testifying in order for that testimony to be admissible. Gibson.

Pennsylvania Rule of Evidence 701, relating to opinion testimony by lay witnesses, provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

Throughout its history, our Supreme Court permitted individuals, not qualified as experts, but possessing experience or specialized knowledge, to testify regarding technical matters that may have been thought to be within the exclusive province of experts. Gibson. However, a witness may not testify concerning a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Pa.R.E. 602. Personal knowledge may be established by the witness's own testimony. Id.

In the present case, the WCJ found Fire Commissioner's testimony to be persuasive and credible in its entirety. F.F. No. 30. Fire Commissioner testified regarding his extensive experience in the fire service as a member of several volunteer fire companies and as a fire protection specialist for the U.S. Air Force. F.F. No. 15a; Mann Dep. at 7-8; R.R. at 354a-55a. Fire Commissioner's duties include responsibility for the State Fire Academy and providing training to 2,000

31

fire departments in 67 counties. Fire Commissioner also serves as liaison between the fire service, the Governor's Office, and the General Assembly. F.F. No. 15b; Mann Dep. at 8; R.R. at 355a.

In particular, the WCJ afforded great weight to Fire Commissioner's testimony regarding the purpose of the PennFIRS reporting requirements. F.F. No. 30. Fire Commissioner stated he was appointed to office in 2000, prior to the PennFIRS rollout in late 2001/early 2002. Mann Dep. at 46; R.R. at 393a.

The WCJ also credited Fire Commissioner's testimony that firefighters are exposed to carcinogens in the fire service and that exposure to carcinogens at fire scenes is not evaluated as part of PennFIRS or NFIRS. F.F. No. 30. The WCJ also found that Fire Commissioner's credibility was "supported by his knowledge of the purpose of Act 46." Id.

On cross-examination, Fire Commissioner testified that the purpose of the Act 46 reporting requirement is to record that a firefighter making the claim could prove that he actually attended the fire. F.F. No 15j; Mann Dep. at 27-28; R.R. at 374a-75a. Based on discussions he had with various other professionals in the fire service, Fire Commissioner believed the only real purpose of the PennFIRS reporting requirements was to establish that an individual actually attended the fire. Mann Dep. at 29-30; R.R. at 376a-77a. Any other type of recordkeeping in a volunteer fire company would be "hit and miss at best." Mann Dep. at 30; R.R. at 377a.

Regarding the documentation of carcinogens present at fire scenes, Fire Commissioner testified that in his years of fire service, he did not recall any efforts by anyone to evaluate carcinogens present at a particular fire event. F.F. No. 15e; Mann Dep. at 9-10; R.R. at 356a-57a. Fire Commissioner stated there has never been anything done by a fire department during the regular course of firefighting to ascertain what carcinogens are in the smoke while fighting a fire. Mann Dep. at 10; R.R. at 357a.

Fire Commissioner further testified there is no place in the PennFIRS reports to log or catalog the carcinogens to which a particular firefighter would be exposed during a fire. F.F. No. 15g; Mann Dep. at 14; R.R. at 361a. Similarly, there is no place in PennFIRS to catalog the specific carcinogens to which a firefighter would be exposed to from smoke during overhaul or from diesel exhaust. F.F. No. 15g; Mann Dep. at 14; R.R. at 361a. Therefore, Fire Commissioner testified that PennFIRS reports could not be used to specifically identify the carcinogens to which any volunteer firefighter in Pennsylvania was exposed. F.F. No. 15h; Mann Dep. at 15; R.R. at 362a.

On cross-examination, Fire Commissioner explained that the only practical way to accurately identify and record the specific carcinogens at a fire scene would be to put air monitoring equipment in the building to gather all the particulates. F.F. No. 15k; Mann Dep. at 44; R.R. at 391a. The fire company would then need to ship the samples to a chemist for an analysis. Thereafter, the carcinogens present could be listed in an incident report. Although Fire

Commissioner acknowledged this could be done, he testified it would be cost prohibitive and impractical. F.F. No. 15k; Mann Dep. at 44-45; R.R. at 391a-92a.

Further, although PennFIRS reports include a section to log hazardous materials encountered at fire scenes, Fire Commissioner testified this section was intended to report hazardous material spills or releases, and what remediation steps were taken. Mann Dep. at 38; R.R. at 385a. A hazardous material incident is reported differently than a fire incident. Mann Dep. at 38-43; R.R. at 385a-90a. There is a hazardous material guidebook with a four-digit code that is used world-wide to identify hazardous materials. Mann Dep. at 40; R.R. at 387a. As discussed above, however, there is currently no place in a PennFIRS report to catalog the carcinogens to which a particular firefighter would be exposed during firefighting or overhaul. Mann Dep. at 14; R.R. at 361a.

In sum, the WCJ cited Fire Commissioner's considerable experience with the PennFIRS reporting requirements as both a member of a volunteer fire company and his service as Pennsylvania's Fire Commissioner, as factors that strengthened his credibility. F.F. No. 30. The WCJ also specifically credited Fire Commissioner's testimony regarding the purpose of Act 46. Id. In light of Fire Commissioner's extensive knowledge of the operation of volunteer fire companies, the PennFIRS software, and the history of Act 46, we discern no abuse of discretion in the WCJ's determination that Fire Commissioner's testimony constituted competent evidence of the limited purpose that the PennFIRS reporting requirements in Section 301(f) of the Act were realistically intended to serve. Gibson; Morrison. Further, no abuse of discretion is discerned because the Fire Commissioner's

34

testimony was competent evidence of the practical consequences of competing interpretations of the PennFIRS reporting requirements.

## B. Required Proof of Causation

### 1. Argument

### a. General Causation Requirement

Employer, unfortunately relying on this Court's now-superseded interpretation of Section 108(r) in Sladek, argues that even if Claimant satisfied the Act 46 requirements for volunteer firefighters, the Board erred in determining Claimant had a compensable cancer claim under Section 108(r) of the Act because Claimant failed to prove his large B-cell NH-lymphoma could be caused by exposure to a Group 1 carcinogen. To become eligible for compensation for an occupational disease under Section 108 of the Act, 77 P.S. §27.1, a claimant must prove a disability resulting from a disease enumerated in Section 108 and that the disease arose out of and was related to the claimant's employment. Allingham v. Workers' Comp. Appeal Bd. (City of Pittsburgh), 659 A.2d 49 (Pa. Cmwlth. 1995).

Noting Claimant filed his claim petition under Section 108(r) of the Act, Employer asserts Claimant must first meet the definition of "occupational disease" under Section 108(r), which provides (with emphasis added):

> Cancer suffered by a firefighter which is <u>caused by</u> direct exposure to a carcinogen which is recognized as a Group 1 carcinogen by the [IARC].

77 P.S. §27.1(r).

35

Employer argues Clamant failed to show that he suffers from a specific cancer causally connected to firefighting. Employer thus maintains Claimant is not eligible for compensation under the Act. More specifically, Employer contends that in order to trigger the presumption of credibility in Section 301(f) of the Act, 77 P.S. §414, Claimant must establish his cancer was caused by exposure to a Group 1 carcinogen.

With respect to Claimant's four-prong burden of proof under Sections 108(r) and 301(f), Employer conceded Claimant met the first two prongs by establishing (1) four or more years of firefighting service and (2) that he had cancer. However, Employer asserts Claimant failed to establish (3) that his cancer was a type of cancer caused by exposure to a Group 1 carcinogen found in the firefighter's requirement. Employer further alleges Claimant failed to establish (4) direct exposure to a Group 1 carcinogen as documented by PennFIRS reports.

**b. Competency of Claimant's Medical Evidence**

Employer next alleges Dr. Guidotti's opinion on the precise issue of whether a Group 1 carcinogen caused Claimant's large B-cell NH-lymphoma was equivocal and lacked factual support in the record. Employer asserts Dr. Guidotti did not identify the records or documents he reviewed when he formed his opinion as to the cause of Claimant's lymphoma. Furthermore, Dr. Guidotti authored his report on the causation of Claimant's cancer in September 2015. As such, Dr. Guidotti's report preceded Claimant's deposition, which was taken in October 2015. Thus, Employer alleges, Dr. Guidotti did not hear or read Claimant's testimony before drafting his report on causation.

In addition, Dr. Guidotti did not mention whether he reviewed Claimant's incident participation log, the document Claimant offered to prove direct exposure. Therefore, Employer argues Dr. Guidotti formed a medical causation opinion without any indication of the number or type of fires to which Claimant responded and without any indication as to what carcinogens Claimant encountered while on duty. Rather, Dr. Guidotti based his causation opinion on facts Claimant related in his affidavit.

Moreover, Dr. Guidotti's report included incidents such as a fire at Dow Chemicals and a fire where pesticides were illegally stored in a crawlspace. Because Claimant did not testify as to either incident in his affidavit or deposition, Employer alleges the source of Dr. Guidotti's information about these incidents was unclear and therefore his testimony lacked a proper foundation in the record.

Regarding general causation, Employer asserts Dr. Guidotti acknowledged that the causal relationship between firefighting and large B-cell NH-lymphoma is only now coming under study. As such, the doctor indicated that the evidence is too sparse to be conclusive and thus requires the use of an inference. Consequently, Employer alleges Claimant established only a suspected or probable association between firefighting and large B-cell NH-lymphoma. However, using a weight of the evidence criterion, Dr. Guidotti found a relationship between firefighting and Claimant's lymphoma.

Relying on the report of its expert, Dr. Sandler, Employer further argues Dr. Guidotti attempted to associate the byproduct of burning materials into

halogenated alkene compounds, including TCE, a Group 1 carcinogen found in fire smoke and specifically associated with large B-cell NH-lymphoma. However, Employer asserts, there are no PennFIRS reports, or any other source, which would permit Dr. Guidotti to conclude Claimant had any firefighting exposure to TCE. As such, there is simply no evidence of Claimant's direct exposure to TCE.

Again relying on its expert's report, Employer further argues Dr. Guidotti did not adequately describe his methodology and based his opinion as to causation on speculation and deductive reasoning because of the lack of scientific evidence. To that end, Dr. Guidotti focused only on studies that would affirm the conclusion that firefighting is related to some types of lymphoma. However, these studies focused exclusively on urban firefighters, as opposed to part-time, rural firefighters. None of these studies accounted for the lower exposures of volunteer firefighters.

Employer further asserts expert testimony is required to prove direct exposure to Group 1 carcinogens because such exposure is largely a question of toxicology. In order to determine direct exposure to a particular substance, an expert must calculate the quantity, duration, and volume of the substance and its effect on each affected organ. Employer asserts Dr. Guidotti, Claimant's sole expert, did not and could not make these calculations.

Summarizing, Employer argues, in light of the lack of a factual basis in the record and the use of speculation and inference in the place of scientific methodology, Dr. Guidotti's opinions and report did not constitute substantial,

competent evidence. Therefore, Employer maintains this Court must reverse the grant of Claimant's claim petition.

### c. Employer's Rebuttal Evidence

Employer further alleges that even if Claimant presented enough evidence to warrant application of the presumption of compensability in Section 301(f) of the Act, it produced rebuttal evidence sufficient to overcome the presumption. As a general rule, a presumption is but an evidentiary advantage and its only effect is to shift the evidentiary burden of going forward to the opponent. See In re: Annexation by Borough of Irwin, 67 A.2d 757 (Pa. Super. 1949). When evidence is introduced that rebuts the presumption, it disappears. Id.

Here, Employer argues the WCJ should not have pitted the testimony of Claimant's expert, Dr. Guidotti, against that of its expert, Dr. Sandler, at the rebuttal stage. Rather, the WCJ should have determined whether Dr. Sandler presented substantial competent evidence supporting a proposition contrary to the presumption.

Employer asserts nothing in the text of Section 301(e) or 301(f) of the Act suggests that an employer must prove that a particular lifestyle choice, genetic marker or hazardous exposure caused a particular claimant's cancer. Rather, the only burden imposed upon the employer is to show that the occupation did not cause the disease or injury. Here, Employer argues it provided sufficient evidence to rebut the presumption.

39

In particular, Employer cited an IARC Monograph on firefighting which determined that 90% of municipal fires are extinguished within 5-10 minutes. See Dr. Sandler's Report (Sandler Rep.), 3/14/16, at 6; R.R. at 450a. The length of a fire in a municipal setting drastically limits the potential exposure.

Employer further maintains that its expert, Dr. Sandler, conclusively showed that firefighting and large B-cell NH-lymphoma are not causally linked. Employer argues its burden stopped there. Nevertheless, Dr. Sandler offered other reasons for large B-cell NH-lymphoma. To that end, the strongest known etiologic factor for B-cell lymphomas is a previous infection with the Epstein-Barr virus, a part of the herpes virus family. See Sandler Rep. at 9; R.R. at 453a. The doctor observed that although nothing indicates Claimant suffered from Epstein-Barr, he does have a history of shingles, which has been linked to the development of cancer. Id.

Summarizing, Employer asserts it provided the WCJ with substantial, competent evidence that exposure to Group 1 carcinogens did not cause Claimant's large B-cell NH-lymphoma. Therefore, Employer maintains it rebutted any presumption that Claimant's cancer arose out of and in the course of his employment. As such, Employer contends the WCJ erred as a matter of law in determining that the presumption applied.

## 2. Analysis

## a. General Causation Requirement

As discussed above, in Sladek the Supreme Court interpreted the general causation requirement in Section 108(r) of the Act as requiring a claimant to produce evidence that it is possible that the carcinogen in question caused the type of cancer from which he suffered. However, Section 108(r) does not require the claimant "to prove that the identified carcinogen actually caused [his] cancer." Sladek, 195 A.3d at 208 (emphasis added).

Essentially, the Court interpreted the intent of the general causation requirement was to weed out claims for compensation "for cancers with no known link to Group 1 carcinogens." Id. The Court observed that the burden imposed by Section 108(r) "is not a heavy burden." Id.

Here, Dr. Guidotti opined within a reasonable degree of medical certainty that Claimant's cancer, a specific form of NH-lymphoma, arose out of his occupation as a firefighter. F.F. No. 14i; Report of Dr. Tee L. Guidotti (Guidotti Rep.), 9/10/15, at 6; R.R. at 222a. The WCJ found that Dr. Guidotti credibly established that the IARC recognizes an association between NH-lymphoma and the occupation of firefighting. F.F. No. 32; Guidotti Rep. at 3; R.R. at 219a.

In particular, Dr. Guidotti opined, based upon his experience and his review of all literature, that constituents of fire smoke, particularly TCE, are associated with elevated risk of large B-cell NH-lymphoma. F.F. No. 32; Guidotti Rep. at 5; R.R. at 221a. Focusing on TCE, Dr. Guidotti stated that although

41

firefighters are exposed to many carcinogenic chemicals that may play a role in large B-cell NH-lymphoma, TCE stands out as the leading candidate for causation because of its known association with large B-cell NH-lymphoma and its presence in fire smoke. F.F. No. 32; Guidotti Rep. at 5; R.R. at 221a.

Dr. Guidotti further stated that Claimant has no other recognized risk factors for large B-cell NH-lymphoma. F.F. No. 32; Guidotti Rep. at 6; R.R. at 222a. Therefore, Dr. Guidotti opined, to a reasonable degree of medical certainty, that Claimant's large B-cell NH-lymphoma arose from his occupation as a firefighter. F.F. No. 32; Guidotti Rep. at 6; R.R. at 222a.

In accord with the Supreme Court's decision in Sladek, we must conclude that Dr. Guidotti's medical opinion as to the causation of Claimant's large B-cell NH-lymphoma satisfies the general causation requirement in Section 108(r) of the Act. Dr. Guidotti opined that Claimant's lymphoma arose from his occupational exposure to Group 1 carcinogens in "fire smoke and atmospheres at the fire scene," particularly TCE. Guidotti Rep. at 5; R.R. at 221a (emphasis added). Dr. Guidotti's opinion is sufficient to establish a causal link between Claimant's type of cancer and a Group 1 carcinogen. Sladek.

### b. Competency of Claimant's Medical Evidence

Employer also challenges the competency of Claimant's medical evidence. More specifically, Employer advances several reasons why Dr. Guidotti's opinions as to a causal link between Claimant's large B-cell NH-lymphoma and a Group 1 carcinogen is equivocal and unsupported by the record.

In a case where the causal connection between a claimant's work and his injury is not obvious, the connection must be established by unequivocal medical testimony. Bemis v. Workers' Comp. Appeal Bd. (Perkiomen Grille Corp.), 35 A.3d 69 (Pa. Cmwlth. 2011). Whether an expert's testimony is unequivocal is a question of law fully reviewable on appeal. Id. In reaching that determination, we must review the testimony of a witness as a whole and not take words or phrases out of context. Id. An expert's testimony is unequivocal if, after providing a foundation, he states that he believes or thinks the facts exist. Id. In short, the expert must state not that the injury or condition may have possibly come from the assigned cause, but rather that in his professional opinion, the injury or condition did come from the assigned cause. Id.

Nonetheless, the law does not require that every utterance from an expert on a medical subject be certain, positive, and without reservation or exception. Id. An expert's use of words such as "probably," "likely," and "somewhat" will not render an expert's opinion equivocal as long as the expert does not recant his opinion as to causation. Id. at 72.

Here, Dr. Guidotti's report contains a review of Claimant's medical history and an assessment of his firefighting exposures. Guidotti Rep. at 1-2; R.R. at 217a-18a. A needle biopsy indicated large cell NH-lymphoma. Id. Dr. Guidotti further noted that Claimant served as a firefighter for 39 years in an industrial community. Id. Claimant responded to an average of 12 to 18 fires a year. Id. These included car fires, house fires, and an industrial fire at a chemical plant where the firefighters were engaged in a cloud of thick black smoke. Id.

43

Regarding general causation, Dr. Guidotti acknowledged that the specific relationship between firefighting and large B-cell NH-lymphoma is only now coming under study. Guidotti Rep. at 2; R.R. at 218a. Nonetheless, Dr. Guidotti noted that strong collateral evidence, notably several medical and scientific studies, including a meta-analysis performed by the IARC, establish that there is a causal relationship between firefighting and large B-cell NH-lymphoma. Guidotti Rep. at 3; R.R. at 219a. The doctor further noted, "for firefighters with 20 or more years of experience", epidemiological studies show an elevated risk of lymphomas "approaching or exceeding a doubling." Guidotti Rep. at 4; R.R. at 220a. Therefore, Dr. Guidotti opined it is reasonable to give the benefit of the doubt to the individual claimant on the basis of general causation alone. Id.

Regarding exposure to specific carcinogens, Dr. Guidotti stated:

Collateral evidence that [large B-cell NH-lymphoma] is associated with exposures known to occur during firefighting is strong, however. Fire smoke and atmospheres at the fire scene contain a variety of secondary combustion products, formed by the reaction of organic material produced by burning and chlorine from sources such as polyvinyl chloride furnishings and products in the home. These produce halogenated alkene compounds, including [TCE], an IARC Group 1 carcinogen that is found in fire smoke and has been specifically associated with [large B-cell NH-lymphoma,] as well as other Non-Hodgkin['s] lymphomas. The association has not been separately studied among firefighters as yet.

Firefighters are exposed to many other carcinogenic chemicals that may play a role in [large B-cell NH-lymphoma], but [TCE], an IARC carcinogen, stands out as the leading candidate for causation because of its known association with the disease and its presence in fire smoke.

44

> At present, therefore, the state of the art is that the weight of the evidence favors the conclusion that constituents of fire smoke, particularly [TCE], are associated with elevated risk of [large B-cell NH-lymphoma], specifically.

Guidotti Rep. at 5; R.R. at 221a (footnotes omitted).

As discussed above, Dr. Guidotti concluded, with a reasonable degree of medical certainty, that Claimant's cancer, a specific form of non-Hodgkin's lymphoma, arose out of his work as a firefighter and its associated exposures, "which strongly contributed to his risk of the cancer." Guidotti Rep. at 6; R.R. at 222a (emphasis added). Summarizing, Dr. Guidotti stated:

> There is an elevation in risk for non-Hodgkin['s] lymphomas, in general among firefighters, sufficient to conclude on the basis of scientific evidence that this disease class is associated with occupation as a firefighter. There is strong collateral evidence that [large B-cell NH-lymphoma] is elevated. This collateral evidence suggests that the cause within firefighting is exposure to halogenated alkenes and likely other carcinogens as well. [Claimant] has no other risk factors for this disease. The weight of the evidence therefore strongly supports the conclusion that [Claimant's] lymphoma is causally associated with his work as a firefighter.

Id. (emphasis added).

As noted above, an expert's testimony is unequivocal if, after providing a foundation, he states that he believes or thinks the facts exist. Bemis. In short, the expert must state not that the injury or condition may have possibly come from the assigned cause, but rather that in his professional opinion, the injury or condition did come from the assigned cause. Id.

45

Further, competency when applied to medical evidence, involves a determination that the expert's opinion is sufficiently definite and unequivocal to render it admissible. Cerro Metal Prods. Co. v. Workers' Comp. Appeal Bd. (Plewa), 855 A.2d 932 (Pa. Cmwlth. 2004). "Even if the witness admits to uncertainty, reservation, doubt or lack of information with respect to scientific or medical details, as long as the witness does not recant the opinion first expressed, the evidence in [sic] unequivocal." Id. at 937.

Here, Dr. Guidotti, relying on medical and scientific evidence, concluded, within a reasonable degree of medical certainty, that Claimant's cancer arose out of his work as a firefighter and the exposures associated with it. Dr. Guidotti determined that Claimant had no other risk factors for his type of cancer. The WCJ found this testimony particularly credible. F.F. No. 32. Although Dr. Guidotti acknowledged the lack of specific studies regarding the causal connection between TCE and large B-cell NH-lymphoma in firefighters, the doctor never recanted his opinion. Therefore, viewing Dr. Guidotti's report in its entirety, we determine it to be unequivocal as to the causal relationship between TCE and other carcinogens found in fire smoke and large B-cell NH-lymphoma. Cerro Metal Prods.

Nonetheless, we recognize that Employer takes issue with the scientific evidence Dr. Guidotti cites in support of his opinion. Primarily relying on the report of its expert, Dr. Sandler, Employer points out various alleged flaws in the studies cited by Dr. Guidotti. For example, Dr. Sandler noted that Dr. Guidotti relied on studies involving full-time firefighters rather than volunteer firefighters. Therefore,

Dr. Sandler reasoned that these studies failed to take into account the lower exposures a volunteer firefighter would have.

The WCJ, however, "particularly rejected as not credible" Dr. Sandler's opinion that there is no reliable, scientifically derived evidence that Claimant's time spent as a volunteer firefighter caused him to sustain any exposure that had an impact on the development of his cancer. F.F. No. 32. As the sole fact-finder in workers' compensation cases, the WCJ has exclusive province over issues of credibility and evidentiary weight. A & J Builders, Inc. v. Workers' Comp. Appeal Bd. (Verdi), 78 A.3d 1233 (Pa. Cmwlth. 2013). The WCJ may accept or reject the testimony of any witness, including an expert witness, in whole or in part. Id. In addition, we are bound by the WCJ's credibility determinations. Id.

Further, it is irrelevant whether the record contains evidence to support findings other than those made by the WCJ; the critical inquiry is whether there is evidence to support the findings actually made. Id. Moreover, we must view the evidence in a light most favorable to the prevailing party and give it the benefit of all inferences reasonably deduced from the evidence. Id.

The WCJ found Dr. Guidotti's opinion as to causation competent and particularly credible. F.F. No. 32. The WCJ also afforded Dr. Guidotti's report the "greater weight for persuasion," when compared to that of Employer's expert, Dr. Sandler. Id. Having determined Dr. Guidotti's opinion that Claimant's cancer arose out of his work as a firefighter and the exposures associated with it, including his exposure to Group 1 carcinogens in fire smoke, particularly TCE, to be unequivocal,

47

we reject Employer's contention that Dr. Guidotti's opinion was equivocal and not competent to satisfy the general causation requirement in Section 108(r) of the Act. As discussed above, Dr. Guidotti's medical opinion sufficiently established, at a very minimum, that it is possible that TCE and other carcinogens in fire smoke caused Claimant's cancer. Sladek. Thus, we find Dr. Guidotti's report to be competent medical evidence of causation and sufficient to meet Section 108's standard for general causation as delineated by the Supreme Court in Sladek.

### c. Employer's Rebuttal Evidence

We next address the argument that, even if Claimant presented sufficient evidence to warrant application of the presumption of compensability in Section 301(f) of the Act, Employer produced rebuttal evidence sufficient to overcome the presumption. As discussed above, our Supreme Court recognized that the language in Section 301(f) requires that an employer's rebuttal evidence show that the firefighter's cancer was not caused by firefighting exposures. Sladek, 195 A.3d at 209-10. Because the phrase "a firefighter's cancer" refers to the claimant's cancer, an employer's rebuttal evidence must establish: (1) the specific causative agent of the claimant's cancer; and (2) that exposure to that causative agent did not occur as a result of his work as a firefighter. Id. The Court noted that where, as here, a claimant meets the general causation burden in Section 108(r), the employer may not rebut the evidentiary presumption in Section 301(f) merely by revisiting the general causation requirement and challenging its accuracy. Id. At the rebuttal stage, the issue relates not to the types of cancer relative to potential carcinogens, but rather requires proof that the claimant's cancer was not caused by his occupation as a firefighter. Id.

48

As noted above, the WCJ "particularly rejected as not credible" Dr. Sandler's testimony that there is no reliable, scientifically derived evidence that Claimant's time spent as a volunteer firefighter caused him to sustain any exposure that had an impact on the development of his cancer. F.F. No. 32. Therefore, it cannot rebut the evidentiary presumption in Section 301(f) that Claimant's cancer is causally related to his work as a volunteer firefighter. Sladek.

## C. Subrogation Lien for Benefits Provided by Highmark
### 1. WCJ's Decision

Employer also contends the Board erred in sustaining the WCJ's award of a subrogation lien asserted by Trover, formerly Healthcare Recoveries, Inc., on behalf of Highmark. Employer maintains that Attorney Richard A. Estacio (Subrogee Counsel), a member of a law firm (Gibson Kolb) representing Trover, attempted to assert a subrogation lien on behalf of Highmark for $78,104 for non-workers' compensation medical payments for Claimant's treatment. Employer argues that the documents Subrogee Counsel presented did not establish the necessary elements to prove the existence of an awardable lien and failed to establish the true party in interest.

In his decision, the WCJ found that Claimant submitted Exhibit C-08. F.F. No. 11. In this letter to the WCJ dated May 10, 2016, Subrogee Counsel stated:

> Please be advised that we represent [Trover/Highmark] relative to the latter's subrogation lien for medical benefits in connection with [Claimant's case]. We attempted to Request an Entry of Appearance via [the Workers' Compensation Automation and Integration System (WCAIS)] but it did not go through for some reason.

49

> Accordingly, please allow this letter to serve as my entry of appearance on behalf of Highmark.
>
> To date, Highmark has paid benefits totaling $78,104.00 on behalf of [Claimant]. We were only recently informed that this matter was pending before you, and that the record was recently closed as well. Accordingly, I would respectfully request that the record be reopened for the submission of our lien documentation pursuant to §319 of the Act.

R.R. at 428a.

In response to Subrogee Counsel's correspondence, the WCJ issued an interlocutory order overruling Claimant's objection to the opening of the record and scheduling a hearing for June 13, 2016. See Ex. J-1, Interlocutory Order, 5/25/16; R.R. at 546a. The order directed Subrogee Counsel to provide all parties' attorneys with all the relevant documentation pertaining to the alleged $78,104 in benefits paid to Claimant. Id.

The WCJ also found that Claimant testified his medical bills were being paid by his health insurance coverage, Blue Cross and Blue Shield (BCBS), provided by his employer, the U.S. Post Office. F.F. No. 13gg. With respect to the timeliness of Highmark's subrogation lien the WCJ found:

> Independence [BC] (Highmark) was unable to earlier assert its subrogation interest through no fault of its own, due to an administrative inability to enter appearance as an interested party via [WCAIS]. …

F.F. No. 24. With respect to the amount of the balance of the lien, the WCJ found:

50

A review of Exhibit (D-INBL-01) reveals Trover Solutions['] Consolidated Statement of Benefits (Highmark) naming [Claimant] with service period March 3, 2015 - October 20, 2015 total billed charges $121,960.20; Benefits Provided $78,104.00; Balance Due $78,104.00.

F.F. No. 25. The WCJ also reviewed a 2014 BCBS Benefit Plan, admitted as Exhibit D-INBL-02, which specified that the plan did not cover medical services separately covered by workers' compensation. F.F. No. 26.

The WCJ also reviewed Exhibit D-INBL-03, a 2013 deposition from Jennifer L. Armstrong (WC Supervisor), who worked as the supervisor of the Workers' Compensation Recovery Unit of Trover's predecessor, Healthcare Recoveries, Inc. (HRI). F.F. No. 27a. WC Supervisor described the overall nature of HRI's business as providing subrogation and workers' compensation recovery services to healthcare insurers across the country. Id. WC Supervisor identified an Agent Authorization document as an agency agreement between HRI and Independence BC upon which HRI relied in subrogation matters on behalf of Independence BC. F.F. No. 27d. WC Supervisor also explained the consolidated statements of benefits (CSBs) used to detail the benefits paid by Independence BC and Highmark for cancer treatment in Act 46 cases involving the City of Philadelphia. F.F. No. 27e. In particular, WC Supervisor described how the lien amounts are obtained and processed. Id.

The WCJ found WC Supervisor's testimony competent, significantly persuasive and particularly credible as to the CSB and "the process of identification and diagnosis codes as to medical services provided …." F.F. No. 29. The WCJ

further found in Finding of Fact No. 29 that WC Supervisor's testimony is supported by the detailed lien in the present case for the relevant time period of services Highmark provided to Claimant.  See Trover CSB; Ex. D-INLB-01 (469a-75a).

Ultimately, the WCJ found that "Independence [BC] preserved its lien amounting to $78,104 and is subrogated accordingly pursuant to Section 319 of the Act."  F.F. No. 31.  Accordingly, the WCJ ordered Employer to pay Independence BC (Highmark) $78,104 for benefits provided.  WCJ Order, 10/14/16.  On appeal, the Board affirmed the subrogation lien, but modified the WCJ's order to reflect a subrogation lien on behalf of "Trover Solutions/Highmark rather than Independence [BC]."  Bd. Order, 3/6/18.

## 2. Argument

Employer raises numerous issues regarding the subrogation lien.  First, Employer contends Trover lacks standing because it failed to establish a contractual agency relationship with Highmark.  Although Highmark may have standing as an insurer, Employer argues Trover is not an insurer and thus lacks standing absent proof of an agency relationship with Highmark.  Second, Employer asserts Trover's CSB, admitted as Exhibit D-INBL-01, and the BCBS Service Plan, admitted as Exhibit D-INBL-02, are hearsay documents and are irrelevant to the issue of whether Highmark properly established its right to subrogation.  Third, Employer contends WC Supervisor's deposition, admitted as Exhibit D-INBL-03, is insufficient to establish a contractual relationship between Trover and Highmark.  Employer further asserts WC Supervisor's deposition was taken for cases involving subrogation liens in firefighter cases involving the City of Philadelphia and is

irrelevant here. Fourth, Employer contends Trover's CSB and BCBS Benefits Plans were not properly authenticated and cannot be considered self-authenticating absent certification by the custodian, or another qualified person, to show they are of a regularly conducted activity. Fifth, Employer contends Trover's CSB is irrelevant because it is merely a listing of procedures with no reference to Highmark. Therefore, it cannot establish a relationship between Trover and Highmark.

We recognize that the City of Philadelphia, as an employer, raised similar issues in City of Philadelphia v. Workers' Compensation Appeal Board (Knudson), 165 A.3d 1039 (Pa. Cmwlth. 2017) (en banc). In Knudson, we determined that the employer waived these issues by failing to raise them before the WCJ. Here, however, Employer raised these issues before the WCJ. See Ex. D-03 (Preservation of Objections); R.R. at 437a-42a.

### 3. Analysis
### a. Board Decision

To begin, we note that Employer also raised these issues before the Board. In rejecting Employer's contentions, the Board noted that Trover/Highmark, through Subrogee Counsel's letter, indicated that it was asserting a lien in the amount of $78,104, the amount the WCJ found to be recoverable. See Bd. Op. at 12-13. Trover/Highmark also submitted a CSB indicating that Highmark paid a total of $78,104 on Claimant's behalf related to his cancer diagnosis during the period of March 10 through October 20, 2015. Id. at 13. The Board determined that this evidence constituted substantial, competent evidence to support the WCJ's award of a subrogation lien in the amount of $78,104. Id.

53

## b. Section 319 of the Act

Trover/Highmark sought subrogation under the second paragraph of Section 319 of the Act, 77 P.S. §671, which pertinently provides:

> Where an employe has received payments for disability or for medical expense resulting from an injury in the course of his employment paid by the employer or an insurance company on the basis that the injury and disability were not compensable under this act in the event of an agreement or award for that injury the employer or insurance company who made the payments shall be subrogated out of the agreement or award to the amount so paid, if the right to subrogation is agreed to by the parties or is established at the time of the hearing before the [WCJ] or [Board].

The second paragraph of §319 contemplates subrogation established either by contract or by litigation. Indep. Blue Cross v. Workers' Comp. Appeal Bd. (Frankford Hosp.), 820 A.2d 868 (Pa. Cmwlth. 2003). Subrogation under this paragraph is neither automatic nor absolute. Id. Moreover, it is not self-executing and must be asserted with reasonable diligence. Id.

## c. Discussion

First, we reject Employer's contention that Trover lacks standing as a subrogation agent because it failed to establish a contractual agency relationship with Highmark. As indicted by his letter asserting Highmark's subrogation interest in this case, Subrogee Counsel explicitly entered his appearance on behalf of Highmark. See Ex. C-8; R.R. at 428a. In his interlocutory order, the WCJ noted that he received Subrogee Counsel's letter in May 2016, prior to the scheduled close of the record on July 1, 2016. R.R. at 546a. Subrogee Counsel's letter stated that Highmark had a subrogation lien for $78,104 in paid benefits. Id. This is sufficient

to establish that Highmark timely preserved its subrogation lien under Section 319 of the Act by asserting it before the close of the record. Evans v. Workers' Comp. Appeal Bd. (Highway Equip. and Supply Co.), 94 A.3d 1091 (Pa. Cmwlth. 2014).

Further, WC Supervisor testified in her deposition that HRI, Trover's predecessor, provides subrogation and workers' compensation recovery services to healthcare insurers across the nation. F.F. No. 27a; Dep. of Jennifer L. Armstrong (Armstrong Dep.) at 5; R.R. at 486a. WC Supervisor acknowledged that her testimony as to HRI/Trover's representation of Independence BC and Highmark will be relative to the general, overall process of how these subrogation matters are handled. F.F. No. 27b; Armstrong Dep. at 6-7; R.R. at 487a-88a. WC Supervisor further testified that HRI/Trover executes an agency authorization document with the healthcare insurer it represents and that it relies upon this document in pursuing subrogation matters. F.F. No. 27d; Armstrong Dep. at 13-14; R.R. at 494a-95a.

Thus, WC Supervisor's accepted testimony established a course of dealing or industry practice between HRI/Trover and insurers, established the insurer/clients as the source of documents upon which it relies when it undertakes extensive recovery services, and establishes how the documents are created and maintained in the regular course of business.

Given the findings by the WCJ and the evidence supporting them, we reject Employer's contention that Trover failed to produce sufficient evidence of an agency relationship with Highmark for purposes of asserting a subrogation lien on Highmark's behalf. We must examine the record in its entirety to determine if it

55

contains sufficient evidence to support the WCJ's findings. Knudson; A & J Builders.

Although WC Supervisor testified regarding HRI's role in subrogation matters in Act 46 cases involving Philadelphia firefighters, the WCJ could reasonably infer from Subrogee Counsel's letter and WC Supervisor's testimony about HRI/Trover's course of conduct and reliance, that Trover represents Highmark as an authorized agent, or at least an apparent agent, in this subrogation matter. This is especially true in the absence of any evidence that HRI/Trover's business practices, course of conduct or reliance changed after WC Supervisor's testimony.

"The creation of an agency relationship requires no special formalities." B & L Ashphalt Indus., Inc. v. Fuso, 753 A.2d 264, 269 (Pa. Super. 2000). To establish an agency relationship, direct proof of specific authority is not needed where it can be inferred from the facts that the parties intended to create an agency relationship. Id.

As a final point on the standing matter, there is no dispute that Claimant incurred medical bills. Also, there is no assertion that the bills remain unpaid. Further, no entity other than Highmark claims to have paid the bills. These circumstances tend to support the Board's ultimate determination that Highmark, through its agent Trover, is a proper party to assert subrogation.

Second, the WCJ also accepted WC Supervisor's testimony regarding the process of determining the lien amounts in HRI/Trover's CSBs as competent,

56

significantly persuasive and particularly credible. F.F. No. 29. WC Supervisor testified as to how the lien amounts in the CSBs for benefits paid by healthcare insurers related to the firefighters' cancer claims are determined. Armstrong Dep. at 15-20; R.R. at 496a-501a. WC Supervisor further stated that the CSBs and the cumulative lists related to them are records kept in the ordinary course of business. Armstrong Dep. at 20; R.R. at 501a.

The WCJ also found that WC Supervisor's testimony regarding the CSBs was supported by the lien detail in Trover's CSB in this case, which was admitted into evidence as Exhibit D-INBL-01. F.F. No. 29. Trover's CSB includes an itemized list of medical benefits provided to Claimant for treatment of his large B-cell NH-lymphoma. See R.R. at 469a-75a.

Nevertheless, Employer maintains that Trover's CSB is a hearsay document and that WC Supervisor's testimony is insufficient to authenticate it because she does not work for Highmark. We disagree. Commonwealth agencies are not bound by the technical rules of evidence in agency proceedings, and all relevant evidence of reasonably probative value may be received. 2 Pa. C.S. §505; Gibson. This statutory maxim has been properly interpreted to permit a relaxation of the strict rules of evidence in agency hearings and proceedings, including those held by a WCJ. Gibson. Generally, issues concerning the admission and exclusion of evidence fall within the sound discretion of the administrative tribunal and will not be reversed on appeal absent a finding of an abuse of discretion. Id.

Nonetheless, for a hearsay document to be admissible into evidence under the business records exception in Pa.R.E. 803(6), it must be supported by evidence sufficient to support a finding that the item is what the proponent claims it is. Keystone Dedicated Logistics, Inc. v. JGB Enters., Inc., 77 A.3d 1 (Pa. Super. 2013). Thus, the authentication requirement is satisfied by evidence sufficient to support a finding that the document in question is what its proponent claims. Keystone (citing Zuk v. Zuk, 55 A.3d 102 (Pa. Super. 2012)).

As noted above, WC Supervisor testified that the CSBs and the cumulative lists related to them are records kept in the ordinary course of business. Armstrong Dep. at 20; R.R. at 501a. Under the business records exception, it is not necessary to produce either the individual who made the entries or the custodian of the record at the time the entries were made or to establish that the witness qualifying the business record had personal knowledge of the facts reported in the business record. Virgo v. Workers' Comp. Appeal Bd. (Cty. of Lehigh-Cedarbrook), 890 A.2d 13 (Pa. Cmwlth. 2005). To that end, the person who received the document can also authenticate what he or she received and acted upon. Keystone; Zion Bullitt Ave Ltd. v. Westmoreland Cty. Tax Claim Bureau (Pa. Cmwlth., No. 1396 C.D. 2014, filed June 5, 2015) (unreported), 2015 WL 5446796.

As to Employer's claim that WC Supervisor's testimony is inadequate and irrelevant, we disagree. As observed above, in the absence of evidence that HRI/Trover's business practices, course of conduct and reliance changed after WC Supervisor's testimony, the WCJ could infer that the described activity continued.

58

Additionally, the CSB provides on its face that it pertains to cancer treatment rendered to the named Claimant during the period of his disability. This information is corroborated by Subrogee Counsel's professional representations in his letter to the WCJ. We further note the WC Supervisor's testimony of creation of and reliance on documents in HRI/Trover's recovery services business, and the absence of evidence that the business practices changed. Given all the foregoing, we discern no abuse of discretion by the WCJ in determining that the CSB was what its proponent claimed, Pa.R.E. 901(a)(authentication generally), and that there was nothing about the document's circumstances which created a suspicion about a lack of trustworthiness. Pa.R.E. 803(6)(E)(exception to rule against hearsay; records of a regularly conducted activity).

The object of authentication under the business records exception is to establish a presumption of trustworthiness to offset the hearsay character of the evidence. Virgo. We note that Employer did not offer any evidence to challenge authentication or trustworthiness of the CSB.

In sum, viewing the record in its entirety, and in a manner favorable to the party prevailing before the compensation authorities, we hold that the WCJ's award of a subrogation lien in favor of Highmark for $78,104 is supported by competent, substantial evidence. Evans.

## IV. Conclusion

For the reasons stated above, we affirm the order of the Board.

_____
ROBERT SIMPSON, Judge

Judge Fizzano Cannon did not participate in the decision in this case.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bristol Borough, : 
              Petitioner : 
               :    No. 464 C.D. 2018
           v. : 
               : 
Workers' Compensation Appeal : 
Board (Burnett), : 
            Respondent : 

## **O R D E R**

**AND NOW**, this 22nd day of March, 2019, for the reasons stated in the foregoing opinion, the order of the Workers' Compensation Appeal Board is **AFFIRMED**.

 

                        _____

                        ROBERT SIMPSON, Judge