IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lake Ariel Volunteer Fire Company, :
                        Petitioner :
                                 :
                    v. : No. 92 C.D. 2024
                                 : Argued: March 4, 2025
Alex Rae (Workers' Compensation :
Appeal Board), :
                    Respondent :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                   HONORABLE STACY WALLACE, Judge (P.)
                   HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER       FILED: April 1, 2025


      Alex Rae (Claimant) was diagnosed with various cancers after decades of being a firefighter, most recently as a volunteer for the Lake Ariel Volunteer Fire Company (Employer). Certain cancers are known to have a causal connection to firefighting, and so the legislature created a presumption that those cancers are caused by being a firefighter for purposes of the occupational disease provisions of the Workers' Compensation Act (Act).[1] A Workers' Compensation Judge (WCJ) granted Claimant's Claim Petition awarding benefits, and the Workers' Compensation Appeal Board (Board) affirmed. Employer has appealed, raising four

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710. Specifically at issue are Section 108(n) and (r), 77 P.S. § 27.1(n), (r), Section 301(f), 77 P.S. § 414, and Section 301(c)(2), 77 P.S. § 411(2). Section 108 was added by Section 1 of the Act of October 17, 1972, P.L. 930, and was amended by Section 1 of the Act of July 7, 2011, P.L. 251, No. 46 (Act 46) to include paragraph (r). Section 301(f) was added by Section 2 of Act 46, and Section 301(c)(2) was added by Section 9 of the Act of December 5, 1974, P.L. 782.

issues: (1) whether Claimant timely notified Employer of a work injury; (2) whether there was substantial evidence in the form of reports from the Pennsylvania Fire Information Reporting System (PennFIRS) or substantially similar reports to support a finding that Claimant was exposed to carcinogens; (3) whether the WCJ capriciously disregarded competent evidence that Human Papillomavirus (HPV), with which Claimant was also diagnosed, causes oral cancer; and (4) whether the WCJ failed to make essential findings of fact as to essential elements of the Claim Petition. After review, we affirm.

## I.    BACKGROUND

Claimant filed a Claim Petition asserting he was diagnosed with "cancer of the head, neck, and throat/oral squamous cell carcinoma" following exposure to International Agency for Research on Cancer (IARC) Group 1 carcinogens while a volunteer firefighter for Employer. (Reproduced Record (R.R.) at 2a.)[2] The Claim Petition stated notice was given verbally to Employer on March 4, 2021. (*Id.* at 3a.) The Claim Petition initially sought indemnity and medical benefits, but the claim for indemnity benefits was later withdrawn, leaving only a claim for medical expenses. (*Id.* at 4a; WCJ Decision Finding of Fact (FOF) ¶ 4.)

Employer filed an answer denying the allegations and asserting, among other things, that Claimant did not provide appropriate notice. (Answer, Certified Record (C.R.) Item 4.) Employer had previously issued a Notice of Workers' Compensation Denial (NCD), stating "additional information is needed on the claim. Once

---

[2] Claimant initially filed a claim petition on March 7, 2022, but the Bureau of Workers' Compensation (Bureau) changed the employer to Maplewood Fire Company, which the parties agreed was incorrect. (WCJ Decision Finding of Fact (FOF) ¶¶ 2-3.) That claim petition was withdrawn and the Claim Petition at issue was filed. (*Id.*) The WCJ found the "Bureau *sua sponte* changed the [e]mployer again to Maplewood Fire Company," while Employer was correctly named in the Claim Petition. (*Id.* ¶ 3.)

2

received and reviewed a determination will be made." (C.R. Item 29.) The box for failure to give notice was not checked. (*Id.*)

The matter was assigned to a WCJ.

### A. *Proceedings before the WCJ*

At hearings before the WCJ, Claimant testified as follows.[3] Claimant, age 72, began firefighting in New York in 1976 and did so for approximately 28-29 years before volunteering at another fire company in Pennsylvania. (FOF ¶ 6.) He started with Employer in 2013 or 2015 and served as president and assistant chief. (*Id.*) Claimant described responding to emergency scenes, including fires and motor vehicle accidents, with Employer. (*Id.* ¶ 9.) Claimant worked in each of the three fire houses that comprise Employer, none of which have a diesel fuel emission capture system despite having diesel-powered trucks. (*Id.* ¶ 10.) Therefore, Claimant was exposed to diesel emissions while the trucks were started for a fire alarm or training. (*Id.*) At times, the doors needed to be opened because diesel fumes filled the entire bay. (*Id.*) In addition to exposure at the fire houses, Claimant was exposed to such fumes at incident scenes, as well as in his experience with prior fire companies. (*Id.*) Claimant described engaging in interior and exterior firefighting operations over the course of his career, which exposed him to smoke and soot. (*Id.* ¶¶ 11, 13.) Breathing protection was usually only worn when making entry to a fire. (*Id.* ¶ 12.) Claimant also was responsible for salvage and fire investigations, during which there was also smoke and soot exposure without

---

[3] Claimant testified at the March 30, 2022 and September 7, 2022 hearings. Claimant's testimony can be found on pages 12a through 57a and 80a through 97a of the Reproduced Record.

3

breathing protection. (*Id.* ¶ 14.) Claimant also described how bunker gear[4] had visible soot on it following fires and was stored in the truck room. (*Id.* ¶ 15.)

In March 2021, Claimant was diagnosed with oral cancer and medical records dated March 19, 2021, confirm this. (*Id.* ¶¶ 9, 16.) The record indicates the impression was: "1) biopsy – proven squamous cell carcinoma in the base of the tongue with metabolically active mass. There is localized metabolically active right cervical lymphadenopathy; 2) hypermetabolic focus with the prostate without CT correlate. This may be physiological or due to malignancy." (*Id.* ¶ 9.) A biopsy was ordered after Claimant had difficulty swallowing for two months. (*Id.*) The biopsy revealed the tumor's cells were positive for "P63 and P16, as well as positive for HR HPV." (*Id.*) Claimant testified he was diagnosed with HPV within 30 days of the cancer diagnosis. (*Id.*)

Following his diagnosis, Claimant testified he informed Employer in writing and orally that he believed the cancer was caused from his firefighting service. (*Id.* ¶ 16.) Claimant described his treatment in South Carolina and having been diagnosed with stage 4 lung cancer after a checkup, for which he is currently receiving treatment. (*Id.*) Claimant denied ever using any tobacco products and stated he previously drank occasionally, what he considered a "social/regular drinker," but he no longer does. (*Id.* ¶ 17.) Claimant denied being a heavy drinker. (*Id.*)

Claimant's full-time employment was at his restaurant and catering business, which served, among other things, barbecue. (FOF ¶ 18.) The business closed in 2017-18 after his wife, who was the cook, was injured. (*Id.*) Although Claimant helped his wife at times, he primarily worked in the front end and was not aware of

---

[4] According to Claimant, bunker gear is personal protection gear that is worn, such as pants, jacket, helmet, a hood, gloves, and boots. (3/30/22 Tr. at 19, R.R. at 24a.)

4

any hazardous exposures. (*Id.*) Claimant also served in Vietnam, where he was exposed to Agent Orange, and volunteered at the World Trade Center site. (*Id.* ¶ 19.) Claimant denied developing any cough after being at the World Trade Center site. (*Id.*)

Claimant also presented medical records from 2017 through 2019, none of which referenced any cancer diagnosis. (*Id.* ¶¶ 8, 20.) Some of Claimant's records also confirm he never smoked and did not abuse alcohol, (*id.* ¶¶ 8, 9), whereas another indicated he "used to be a heavy drinker and not now," (*id.* ¶ 20). When asked about the latter record, Claimant testified he would have reported drinking but not heavily. (*Id.* ¶ 20; 9/7/22 at 30, R.R. at 95a.) For the time period between 2018 and 2022, Claimant testified he drank maybe once or twice per year. (9/7/22 Tr. at 30, R.R. at 95a; *see also* 3/30/22 Tr. at 44, R.R. at 49a (testifying before his diagnosis, Claimant drank "very little, if any. Maybe a couple times a year. That would've been the most of it.").)

At the second hearing, Claimant also introduced a list of calls to which he responded for Employer from March 7, 2013, through July 4, 2020. (R.R. at 127a-48a.) The report is comprised of seven columns: first name, last name, telephone number, manual entry by, date, time, and to where responding. (*Id.*) Claimant's counsel stated Employer "provided us a list summary of [Claimant]'s calls for the fire company from 2013 through I think 2020 . . . that [] they – they can run off of fire reports that are sent to the Pennsylvania Fire and Emergency Reporting or through the Pennsylvania Fire and Emergency Reporting System to the Governor's office." (9/7/22 Tr. at 11, R.R. at 76a.) Claimant's counsel explained those reports are an element of a claimant's case and Claimant was going to identify the "report summary that's produced off of those reports" given his leadership position. (9/7/22

Tr. at 11-12, R.R. at 76a-77a.) Claimant's counsel identified the report as one received "through discovery from" Employer. (9/7/22 Tr. at 20, R.R. at 85a.) Claimant testified that in his leadership positions with Employer, he was familiar with the way reports were submitted to PennFIRS, which is a computerized system, and the listing provided came from reports submitted to PennFIRS. (FOF ¶ 7; 9/7/22 Tr. at 21, R.R. at 86a.)

Claimant also introduced an excerpt of the IARC evaluation of chemicals and metals found in diesel and gas emissions, which contain polycyclic aromatic hydrocarbons (PAHs) and nitroarenes, as well as excerpts of the evaluations and cancer sites in humans of chemicals measured at fires. (FOF ¶¶ 21-22 (citing Exs. C-06 & C-07).[5])

In addition, Claimant introduced the February 29, 2022 report of Tee Guidotti, M.D., MPH, who is board certified in internal, pulmonary, and occupational medicine, is a Diplomate of the American Board of Toxicology, and holds a Qualified Environmental Professional credential with a specialization in air quality.[6] (*Id.* ¶ 23.) Dr. Guidotti's report stated as follows. Dr. Guidotti described how Claimant's symptoms originated and the results of a March 11, 2021 computed tomography scan that showed "a large, lobulated oropharyngeal mass at the base of the tongue on the right but extending across the midline" and on March 25, 2021, a 2-centimeter palpable lymph node on the right upper neck. (*Id.* ¶ 23(a).) A laryngoscopy showed a "friable mass at the base of the tongue." (*Id.*) A biopsy revealed squamous cell carcinoma with staining that was positive for P63, P16, and HPV. (*Id.* ¶ 23(c).) Dr. Guidotti noted Claimant never used tobacco products and was reported to have drunk alcohol heavily, though the amount of alcohol

---

[5] These exhibits are in the Certified Record at Items 16 and 17, respectively.
[6] This report is in the Certified Record at Item 14.

6

consumption is contradicted by other medical records. (*Id.*) Dr. Guidotti described Claimant's military and employment history, including his deli/catering business and his 44 years of firefighting, which included 8 days at the World Trade Center site. (*Id.* ¶ 23(d).) Dr. Guidotti explained how Claimant's firefighting service included cutting through floors and ceilings that contain asbestos, which was also present on roof shingles and pipe lagging. (*Id.* ¶ 23(e).) During fire suppression and overhaul, Dr. Guidotti explained how firefighters would be exposed to a full range of carcinogens and how overhaul conditions favor formation of carcinogens, and Claimant would have been exposed to soot on the skin during such exercises. (*Id.*) Dr. Guidotti stated Claimant's bunker gear was never professionally cleaned, and before Employer got a dedicated commercial washer around 2018, firefighters hosed down their gear. (*Id.*) Dr. Guidotti also opined that Claimant would have been exposed to diesel exhaust as the only fire hall with a capture system in which he worked was when Claimant served in New York. (*Id.*)

Dr. Guidotti further explained that the phrase "'head and neck' cancer is a term of art for the collection of cancers that, while very disparate in terms of tissue and structures, have underlying uniformity in the tissues that are involved." (*Id.* ¶ 23(f).) In Dr. Guidotti's opinion, neck cancers are usually associated with sunlight exposure, previous cancer or radiation treatment, tobacco use, and occupational exposures. (*Id.*) Oropharyngeal cancers are becoming more common, but due to improved treatment, they are less fatal. (*Id.*) Dr. Guidotti opined that HPV16 alone does not cause oropharyngeal cancer; rather, it "remove[s] the mechanism for cancer suppression and allow[s] the cancer to proliferate, once it gets started in the head and neck." (*Id.* ¶ 23(g).) Dr. Guidotti opined there is debate in the scientific community as to whether an HPV 16 infection causes cancer. (*Id.*) For instance, Dr. Guidotti

7

stated the Centers for Disease Control and Prevention (CDC), which Dr. Guidotti considered to be "the highest authoritative body on chronic disease in the United States," found that "[c]ancer caused by HPV often takes years to develop" and "[i]t is unclear if having HPV alone is enough to cause oropharyngeal cancer, or if other factors (such as smoking or chewing tobacco) interact with HPV to cause these cancers." (*Id.* ¶ 23(g); *see also id.* ¶ 23(i).) The CDC concluded, per Dr. Guidotti, that more research was needed. (*Id.* ¶ 23(g).)

Dr. Guidotti also reviewed epidemiological studies of the incident rate of head and neck cancer in fire service and concluded such cancer has a known association. (*Id.* ¶ 23(h).) He also outlined epidemiological studies showing an increase in the incident rate of oral cancer in firefighters. (*Id.*) Utilizing epidemiological evidence, Dr. Guidotti listed IARC Group 1 carcinogens, such as PAHs, coarser particulate matter, nitroarenes, small molecular weight hydrocarbons, and 1-3 butadiene, that cause oral pharyngeal cancer. (*Id.* ¶ 23(i).) He explained that several PAHs are known carcinogens in isolation and in mixtures and are found at all fires and in diesel emissions and that nitroarenes are a component of diesel exhaust. (*Id.*) He specifically pointed to PAHs as a cause of Claimant's oral cancer. (*Id.*) According to Dr. Guidotti, the CDC believes exposure to these carcinogens enhances the effects of HPV infection. (*Id.*) Dr. Guidotti explained "that when exposure to chemical carcinogenesis from fire smoke exist[s] with infection with HPV16, the chemical is the cause of the cancer, not the virus." (*Id.* ¶ 23(j).) It does this by retaining the original risk of chemical carcinogenesis, the HPV knocking out the ability to resist carcinogenesis, enhancing the carcinogenic effect, and increasing the viral field and proliferation, which causes positive feedback and vastly enhances the carcinogenic effect. (*Id.*) In Dr. Guidotti's professional opinion, Claimant's exposure to IARC

8

carcinogens, especially PAHs, while firefighting substantially contributed to the cause of his oral cancer. (*Id.* ¶ 23(k).)

Employer presented an August 31, 2022 report by David Goldsmith, who has a master's degree in public health and a PhD in epidemiology but no medical degree or toxicology certification.[7] (*Id.* ¶ 24.) Therein, Dr. Goldsmith explained he was asked to summarize "the current epidemiologic evidence relating firefighter exposure/experience and the risk of tongue (and head and neck) cancer." (*Id.* ¶ 24(a).) His report focused on this connection and "workplace and personal exposures related to the assessment of general causation in the case of Claimant who was a volunteer firefighter." (*Id.*) In the report, Dr. Goldsmith noted the positive HPV diagnosis and a "nearly two-decade problem with excess alcohol intake." (*Id.* ¶ 24(a), (e).) He was unsure when Claimant's "heavy drinking stopped," but noted there were records from 2018 indicating Claimant was a "19[-]year alcohol (beer) user." (*Id.* ¶ 24(e).) Dr. Goldsmith agreed that, "by definition," firefighters were exposed to IARC carcinogens. (*Id.* ¶ 24(b).) Although Claimant was exposed to Agent Orange, Dr. Goldsmith admitted there was inadequate evidence for an association of exposure to oral cancer. (*Id.* ¶ 24(c).) He stated that "'we' know that there are some epidemiological studies of firefighters showing a positive link with oral/head and neck cancers." (*Id.* ¶ 24(f).) According to Dr. Goldsmith, "assuming [firefighting] plays a role in his oral cancer causation, [Claimant's] last six years as a [firefighter] in Pennsylvania contributes nearly nothing to his likelihood of tumorigenesis, while his 29 years of firefighting in New York acts to overwhelm his very modest . . . [firefighting] work history in Pennsylvania." (*Id.* ¶ 24(g).) In his professional epidemiological opinion, Dr. Goldsmith did not believe Claimant's

---

[7] Dr. Goldsmith's report can be found in the Certified Record at Item 22.

cancer was related to his time firefighting in Pennsylvania, indicating that his 19 years of alcohol abuse was the biggest risk factor. (*Id.* ¶ 24(h).) Other substantial contributing factors included his positive HPV status, exposure to Agent Orange, and his barbecue business. (*Id.*)

In response to Dr. Goldsmith's report, Claimant presented a September 21, 2022 rebuttal report from Dr. Guidotti.[8] (*Id.* ¶ 25.) Dr. Guidotti pointed out that Dr. Goldsmith is not a licensed health professional or practitioner but an epidemiologist, which deals with populations. (*Id.* ¶ 25(a).) In Dr. Guidotti's opinion, Dr. Goldsmith "has gone far out on a limb" to assert Claimant was an alcoholic as the evidence did not show Claimant was. (*Id.* ¶ 25(b).) According to Dr. Guidotti, the record Dr. Goldsmith referenced said Claimant "consumed" alcohol for 19 years and does not state he abused it. (*Id.*) The only medical record Dr. Guidotti reviewed that supported alcohol abuse was a December 2019 note, which is not supported by any other records. (*Id.*) Dr. Guidotti stated the Wilkes-Barre Veterans Administration (VA) Hospital records provide the most comprehensive record of substance abuse and do not include a diagnosis of either alcohol abuse or alcoholism, which is something with which Claimant has never been diagnosed. (*Id.*) Dr. Guidotti stated Dr. Goldsmith was misunderstanding the context of the statements in the records as to Claimant's alcohol use, which only related to duration. (*Id.*) Dr. Guidotti also believed Dr. Goldsmith was unfamiliar with firefighting practice and principles. (*Id.* ¶ 25(c).) Concerning Claimant's HPV, Dr. Guidotti believed Dr. Goldsmith lacked knowledge of its role as a risk factor, instead of a cause, of cancer. (*Id.* ¶ 25(d).) Dr. Guidotti explained that HPV makes it more likely that a cancer caused by something else develops into cancer but it does not cause cancer by itself. (*Id.*) Dr. Guidotti

---

[8] Dr. Guidotti's rebuttal report can be found in the Certified Record as Item 15.

reiterated his professional opinion that Claimant's firefighting was a significant contributing factor of his head and neck cancer.  (*Id.* ¶ 25(e).)

Employer also submitted an October 28, 2022 rebuttal report by Dr. Goldsmith wherein Dr. Goldsmith reiterated his opinion that Claimant's firefighting experience in Pennsylvania was not related to his cancer.[9]  (*Id.* ¶ 27.)

### B.    WCJ's Decision

Based upon the evidence presented, the WCJ credited Claimant's testimony, noting it was undisputed as to his job duties and exposures, including to IARC Group 1 carcinogens.  (*Id.* ¶ 28.)  The WCJ found the reports Claimant presented established his fire service exceeded the statutory four-year period.  (*Id.*)  The WCJ also credited Claimant's testimony that that he was diagnosed in March 2021, as it was supported by the medical records, which did not show any prior diagnosis.  (*Id.*)  The WCJ found Claimant never smoked, which was also supported by the medical records.  (*Id.*)  As for Claimant's alcohol use, the WCJ accepted Claimant's testimony that he was not a heavy drinker.  (*Id.*)  Finally, with regard to Claimant's role in his restaurant, the WCJ credited Claimant's testimony that he only assisted his wife with cooking and instead worked the "front of the house."  (*Id.*)

Between the two experts, the WCJ found Dr. Guidotti more credible than Dr. Goldsmith.  (*Id.* ¶ 29.)  The WCJ explained he gave more weight to Dr. Guidotti's opinions since he was a medical doctor who was highly credentialed with certifications in toxicology, air quality, and air pollution.  (*Id.*)  The WCJ also noted Dr. Guidotti performed research in the field of toxicology, including occupational exposures of firefighters.  (*Id.*)  The WCJ found Dr. Guidotti's report "provide[d] credible confirmation that Claimant's head and neck/oral cancer was possibly caused

---

[9] Dr. Goldsmith's rebuttal report can be found in the Certified Record as Item 25.

by IARC Group 1 carcinogens found in fire smoke and diesel emissions, such as PAHs." (*Id.*) The WCJ specifically accepted Dr. Guidotti's opinion concerning Claimant's HPV diagnosis and how it suppresses the ability to resist carcinogenesis and enhances the carcinogenic effect of exposures to fire smoke and diesel exhaust. (*Id.*) The WCJ also noted that Dr. Guidotti considered Claimant's career as a firefighter, unlike Dr. Goldsmith who limited his opinion to Claimant's service in Pennsylvania. (*Id.*) In addition, the WCJ accepted Dr. Guidotti's opinion that alcohol use is a risk factor, but not a cause, of cancer. (*Id.*)

The WCJ specifically rejected Dr. Goldsmith's opinions to the extent they conflicted with Dr. Guidotti's, again noting Dr. Goldsmith is not a medical doctor. (*Id.* ¶ 30.) The WCJ further explained that he found Dr. Goldsmith's "review of the documents suspect," based on conflicting dates of Claimant's last call. (*Id.* ¶ 30(a).) The WCJ also did not credit Dr. Goldsmith's opinion that Claimant's six years of firefighting in Pennsylvania did not contribute to his cancer, reasoning that Claimant still had direct exposure to IARC Group 1 carcinogens in Pennsylvania. (*Id.* ¶ 30(b).) The WCJ rejected Dr. Goldsmith's opinion that Claimant's exposure to Agent Orange was a "big risk factor," noting that Dr. Goldsmith admitted there is inadequate or insufficient evidence to associate it with oral cancer. (*Id.* ¶ 30(c).) The WCJ also rejected Dr. Goldsmith's assertion that Claimant abused alcohol for 19 years, based upon Dr. Guidotti's and Claimant's credited testimony that the time period only reflects the duration of his alcohol consumption, not that he abused it. (*Id.* ¶ 30(d).) To the extent there was any inconsistency in the medical records, the WCJ stated "Claimant did not 'prepare' his medical records." (*Id.*) The WCJ found Dr. Goldsmith was "merely speculat[ing]" about Claimant's barbecue business being a risk factor, which "ignore[d] Claimant's credible testimony" that his wife

12

was the cook.  (*Id.* ¶ 30(e).)  Finally, the WCJ reiterated that he was accepting Dr. Guidotti's opinion about HPV over Dr. Goldsmith's.  (*Id.* ¶ 30(f).)

Accordingly, the WCJ found:

Claimant met his burden of showing his cancer was caused by a work-related exposure to a known carcinogen recognized [as a] Group [1] carcinogen by IARC based upon the credible opinions of Dr. Guidotti. The undisputed evidence of record establishes that Claimant served four or more years in continuous firefighting duties and there was a direct work-related exposure to a carcinogen given the credible testimony of Dr. Guidotti.  Moreover, . . . the evidence of record establishes that Claimant was not diagnosed with cancer until 2021.

(*Id.* ¶ 31; *see also* Conclusion of Law ¶ 3.)  Thus, the WCJ granted the Claim Petition.  (*Id.*)

Thereafter, Employer appealed to the Board.  (R.R. at 198a-204a.)

### C.     *Board's Opinion and Order*

On appeal, the Board affirmed.  It first concluded, based on Claimant's testimony and the Claim Petition, that Claimant provided timely notice to Employer after his diagnosis in March 2021.  (Board Op. at 14-15.)  The Board rejected Employer's argument that Claimant had to testify as to the specific date of notice, citing the WCJ's crediting of Claimant's testimony and the Supreme Court's decision in *Gentex Corp. v. Workers' Compensation Appeal Board (Morack)*, 23 A.3d 528 (Pa. 2011), "stress[ing] the flexibility of the notice requirements."  (*Id.* at 15.)

The Board also rejected Employer's argument that Claimant had to submit PennFIRS reports.  Based on this Court's decision in *Bristol Borough v. Workers' Compensation Appeal Board (Burnett)*, 206 A.3d 585 (Pa. Cmwlth. 2019), the Board reasoned there is no requirement to identify and document the carcinogens

13

encountered and that incident participation reports are sufficient because the purpose of the "statutory requirement was to document a volunteer firefighter's presence at a type of fire where they are routinely exposed to Group 1 carcinogens." (*Id.* at 16.) The Board acknowledged the list provided by Claimant did not detail the types of incidents but explained Claimant credibly testified they were fire calls with smoke and soot present. (*Id.*)

The Board concluded Claimant established he was exposed to carcinogens that cause the type of cancer with which Claimant was diagnosed, that he continuously served at least four years as a firefighter, that he had direct exposure to a Group 1 carcinogen, and that he previously passed a physical examination. (*Id.* at 17.) It explained the WCJ credited Claimant's testimony concerning his firefighting service and exposure to smoke, soot, and diesel fumes and his expert's testimony about the presence of carcinogens in diesel fumes and fire smoke. In addition, Claimant's expert testified Claimant's cancer was a type caused by Group 1 carcinogens to which he was exposed and that these carcinogens more likely than not caused Claimant's cancer, all of which the WCJ credited. (*Id.*)

In response to Employer's argument that the WCJ capriciously disregarded evidence that HPV caused Claimant's cancer, the Board explained there is no requirement for a WCJ to address all the evidence presented. (*Id.* at 18.) Moreover, the Board concluded the WCJ rejected the testimony of Employer's expert in favor of Claimant's expert, which was within the WCJ's province to do. (*Id.*)

Since Claimant satisfied the criteria for application of the evidentiary presumption of compensability, the Board explained the burden shifted to Employer to show through substantial, competent evidence that firefighting did not cause

14

Claimant's cancer. (*Id.* at 19.) The Board held that because the WCJ rejected the testimony of Employer's expert, Employer did not rebut the presumption. (*Id.*)

Employer filed a timely petition for review with this Court.[10] On appeal,[11] Employer raises four issues, which we address in turn.

## II. DISCUSSION

### A. General Legal Principles

"[I]n a claim proceeding, the [claimant] bears the burden of establishing a right to compensation and proving all necessary elements to support an award." *Inglis House v. Workmen's Comp. Appeal Bd. (Reedy)*, 634 A.2d 592, 595 (Pa. 1993). Section 301(c)(2) defines an injury to include an occupational disease as defined by Section 108 of the Act. 77 P.S. § 411(2). Section 108(n) defines occupational disease as "[a]ll other diseases (1) to which the claimant is exposed by reason of his employment, and (2) which are causally related to the industry or occupation, and (3) the incidence of which is substantially greater in that industry or occupation than in the general population." 77 P.S. § 27.1(n). In 2011, the Act was amended to add Section 108(r), which expands the definition of occupational disease to include "[c]ancer suffered by a firefighter which is caused by exposure to a known carcinogen which is recognized as a Group 1 carcinogen by the [IARC]." 77 P.S. § 27.1(r). The Act was also amended at that time to add Section 301(f), which provides:

---

[10] On June 18, 2024, we granted Employer's petition for supersedeas in part, as it pertained to the litigation costs also awarded by the WCJ.

[11] Our review is limited to determining whether constitutional rights were violated, whether errors of law were committed, or whether necessary findings of fact are supported by substantial evidence. *Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 331 n.2 (Pa. 2000).

15

Compensation pursuant to cancer suffered by a firefighter shall only be to those firefighters who have served four or more years in continuous firefighting duties, who can establish direct exposure to a carcinogen referred to in [S]ection 108(r) relating to cancer by a firefighter and have successfully passed a physical examination prior to asserting a claim under this subsection or prior to engaging in firefighting duties and the examination failed to reveal any evidence of the condition of cancer. The presumption of this subsection may be rebutted by substantial competent evidence that shows that the firefighter's cancer was not caused by the occupation of firefighting. Any claim made by a member of a volunteer fire company shall be based on evidence of direct exposure to a carcinogen referred to in [S]ection 108(r) as documented by reports filed pursuant to [PennFIRS] and provided that the member's claim is based on direct exposure to a carcinogen referred to in [S]ection 108(r). Notwithstanding the limitation under [Section 301](c)(2) with respect to disability or death resulting from an occupational disease having to occur within three hundred weeks after the last date of employment in an occupation or industry to which a claimant was exposed to the hazards of disease, claims filed pursuant to cancer suffered by the firefighter under [S]ection 108(r) may be made within six hundred weeks after the last date of employment in an occupation or industry to which a claimant was exposed to the hazards of disease. The presumption provided for under this subsection shall only apply to claims made within the first three hundred weeks.

77 P.S. § 414.

Thus, the Act sets forth a burden-shifting framework for addressing firefighter cancer claims, which includes an evidentiary presumption of compensability if certain elements are met.[12] "Initially, the claimant must establish that he or she has an 'occupational disease,' as that term is defined in Section 108(r)." *City of Phila.*

_____

[12] There is also a presumption in Section 301(e) of the Act, 77 P.S. § 413, which was added by Section 3 of the Act of October 17, 1972, P.L. 930. Section 301(e) provides:

If it be shown that the employe, at or immediately before the date of disability, was employed in any occupation or industry in which the occupational disease is a hazard, it shall be presumed that the employe's occupational disease arose out of and in the course of his employment, but this presumption shall not be conclusive.

*Id.*

16

*Fire Dep't v. Workers' Comp. Appeal Bd. (Sladek)*, 195 A.3d 197, 207 (Pa. 2018). The Supreme Court explained that the initial burden is not a "heavy" one as the claimant need only "establish a general causative link between the claimant's type of cancer and a Group 1 carcinogen." *Id.* at 208. "In other words, the claimant must produce evidence that it is **possible** that the carcinogen in question caused the type of cancer with which the claimant is afflicted.[] It does not require the claimant to prove that the identified Group 1 carcinogen **actually** caused claimant's cancer." *Id.* (emphasis in original) (footnote omitted). Epidemiological evidence can establish general causation under this first prong. *Id.* at 208. Then the claimant must meet the durational, exposure, and no preexisting cancer requirements. *Id.* at 207. If these requirements are satisfied, the burden then shifts to the employer to offer "substantial competent evidence that shows that the firefighter's cancer was not caused by the occupation of firefighting." *Id.* (citation omitted). An employer, though, cannot rely on epidemiological evidence to rebut the presumption. *Id.* at 209. Rather, an employer must show: "(1) the specific causative agent of claimant's cancer, and (2) exposure to that causative agent did not occur as a result of his or her employment as a firefighter," *i.e.*, the employer must "produce a medical opinion regarding the specific, non-firefighting related cause of claimant's cancer." *Id.* at 209.

Finally, as stated in *Borough of Hollidaysburg v. Detwiler (Workers' Compensation Appeal Board)*:

> In evaluating evidence on appeal, . . . the WCJ is the ultimate fact-finder and has "exclusive authority over questions of credibility and evidentiary weight . . . ." *A & J Builders, Inc. v. Workers' Comp. Appeal Bd. (Verdi)*, 78 A.3d 1233, 1238 (Pa. Cmwlth. 2013) (quoting *Anderson v. Workers' Comp. Appeal Bd. (Penn Ctr. for Rehab)*, 15 A.3d 944, 949 (Pa. Cmwlth. 2010)). The WCJ's authority over questions of credibility, conflicting evidence, and evidentiary weight is unquestioned. *Id.* The WCJ may accept or reject the testimony of any

17

witness, including an expert witness, in whole or in part. *Id.* The Board, and this Court, are bound by the WCJ's findings of fact provided they are supported by substantial evidence. *Lindermuth v. Workers' Comp. Appeal Bd. (Strishock Coal Co.)*, 134 A.3d 111, 125 (Pa. Cmwlth. 2016). Neither this Court nor the Board may disregard a WCJ's credibility determinations, or substitute findings of fact for those made by the WCJ with their own. *RAG (Cyprus) Emerald Res., L.P. v. Workers' Comp. Appeal Bd. (Hopton)*, 912 A.2d 1278, 1286 (Pa. 2007).

328 A.3d 569, 580 (Pa. Cmwlth. 2024).

With these principles in mind, we address Employer's issues, in turn.

> B. *Whether there was substantial evidence to support the finding of timely notice.*
>     1. Parties' arguments

Employer argues the record is devoid of competent evidence that would support the WCJ's finding that Claimant provided timely notice of the work injury to Employer. Employer asserts a claimant cannot merely rely on a date of alleged notice in a claim petition to support such a finding. Further, while Claimant testified generally that he provided notice through a letter and orally, Employer argues there is no information as to when or to whom notice was given. Employer argued Claimant retained counsel to represent him in the workers' compensation litigation in June 2021 but did not file the Claim Petition until March 2022. To the extent the WCJ relied upon the date listed by Employer in the NCD, Employer argues this is error because that date, by the terms of the form, represents either the date of notice or the date of the alleged disability. The date listed on the NCD, Employer asserts, coincides with the last day Claimant worked, but that is not the equivalent of notice. Employer argues the Board likewise erred in concluding that because Claimant listed the date of notice in the Claim Petition and the WCJ credited Claimant's testimony, the date was accepted as true, especially when Employer specifically denied the allegation. Because there is no record evidence that Claimant provided notice to

18

Employer within 120 days, Employer argues the Board's decision should be reversed.

Claimant responds after his diagnosis in March 2021, he told Employer, orally and in writing, that he thought his cancer was connected to firefighting and stopped working because of the diagnosis. Moreover, Claimant asserts the NCD establishes Employer was aware as of March 2021.

## 2. Analysis

"Under the Act, notice is a prerequisite to receiving workers' compensation benefits, and the claimant bears the burden of demonstrating that proper notice was given." *Gentex Corp*, 23 A.3d at 534. Section 311 of the Act provides, in pertinent part:

> Unless the employer shall have knowledge of the occurrence of the injury, or unless the employe or someone in his behalf, or some of the dependents or someone in their behalf, shall give notice thereof to the employer within twenty-one days after the injury, no compensation shall be due until such notice be given, and, unless such notice be given within one hundred and twenty days after the occurrence of the injury, no compensation shall be allowed.

77 P.S. § 631. "The 120-day notice period begins to run when [the] claimant knew or reasonably should have known the nature of the injury and its relationship to the employment." *Hunter v. Workers' Comp. Appeal Bd. (Jack Greenberg Co.)*, 706 A.2d 403, 405 (Pa. Cmwlth. 1998). "What constitutes adequate notice is a fact-intensive inquiry, taking into consideration the totality of the circumstances." *City of Pittsburgh v. Workers' Comp. Appeal Bd. (Flaherty)*, 187 A.3d 1061, 1066 (Pa. Cmwlth. 2018).

Here, Employer challenges the WCJ's finding that notice was provided to Employer on March 4, 2021. Employer argues the only evidence in the record to

support this date is the Claim Petition, averring Claimant verbally informed Employer on that date, which Employer denied in its Answer. While Claimant testified to providing notice, Employer argues that testimony lacked any details, such as when and to whom notice was given. Mindful of the humanitarian purpose of the Act and the directive that it "must be construed liberally in the employee's favor in order to effectuate" this objective, *Gentex Corp.*, 23 A.3d at 534, as well as the fact that the WCJ, as factfinder, credited Claimant's testimony, by which we are bound, *Detwiler*, 328 A.3d at 580, when the averments in the Claim Petition and Claimant's credited testimony concerning notice are considered together, as we must, *Flaherty*, 187 A.3d at 1066, we discern no error on this basis.

> *C. Whether there was substantial, competent evidence to support a finding that Claimant was exposed to carcinogens.*

> 1. Parties' arguments

Employer argues Claimant did not show, by competent, substantial evidence, that Claimant was exposed to carcinogens. Instead of presenting PennFIRS reports, as provided by Section 301(f) of the Act, Claimant only presented lay testimony and data from the website, "iamresponding.com." Unlike the PennFIRS reports or other reports that the Court has found to be sufficient, Employer argues the data here only includes a date, station name, and reference to an unspecified "scene," which could be a fire or not. Furthermore, Employer posits that to the extent Claimant testified to make up any deficiencies in the data, this Court has rejected lay testimony as sufficient under the Act.

Claimant responds he met all the requirements for the rebuttable presumption to apply. Specific to the PennFIRS issue, Claimant argues the summaries he provided are the type of evidence authorized by this Court in *Bristol Borough.*

20

Claimant further argues Employer did not rebut the presumption as the WCJ did not credit Employer's expert, who was an epidemiologist, not a medical doctor.

      2.     <u>Analysis</u>

Section 301(f) of the Act provides, pertinent here, that "[a]ny claim made by a member of a volunteer fire company shall be based on evidence of direct exposure to a carcinogen referred to in [S]ection 108(r) as documented by reports filed pursuant to [PennFIRS] and provided that the member's claim is based on direct exposure to a carcinogen referred to in [S]ection 108(r)." 77 P.S. § 414. In *Steele v. Workers' Compensation Appeal Board (Findlay Township)*, 155 A.3d 1173 (Pa. Cmwlth. 2017), we examined the legislative history of the 2011 amendments to the Act specific to firefighters, including its predecessor proposed legislation. We noted the earlier versions of the legislation required PennFIRS reports only "if such fire company participates in the system." *Id.* at 1178 (quoting H.B. 1231, 2009-10 Reg. Sess., Printer Nos. 2547 & 4393). However, that language was removed from legislation that ultimately passed, leaving only the PennFIRS requirement. *Id.* We reasoned: "This signals that the General Assembly was cognizant that not all volunteer fire companies participate in PennFIRS, but such reports would still be required under the Act, thereby potentially foreclosing claims by those who did not participate." *Id.* We also examined the purpose behind the requirement, as stated by the bill's sponsor, which was "a built-in incentive for volunteer fire companies to fully utilize the PennFIRS system and [] push them to provide thorough information when filling out their PennFIRS reports" and that "the utilization of the PennFIRS system would serve to document that the volunteer firefighter was present at an incident where a known carcinogen was present." *Id.* (quoting Pa. Legis. Journal – House, June 21, 2011, at 1338). We stated that "where the amount of actual exposure

21

of the volunteer firefighter is disputed, the conflict is resolved by requiring objective, documentary evidence of exposure to carcinogens in the form of PennFIRS reports." *Id.* Because the claimant there, a widow of a volunteer firefighter, did not present evidence in the form of PennFIRS reports, we held the claimant could not rely on lay testimony to establish exposure to Group 1 carcinogens. *Id.*

Subsequently, in *Bristol Borough*, an *en banc* panel of this Court held that the purpose of the requirement was nonetheless fulfilled by the presentation of incident participation reports, which were based upon information compiled from PennFIRS reports, instead of the PennFIRS reports themselves. In that case, the incident participation reports that were introduced into evidence described the type of incident, such as a cooking, electrical, or building fire, or false alarm, denoted the claimant's participation in the incidents, and were compiled using PennFIRS data. 206 A.3d at 602-03. The employer challenged the use of the incident participation reports, arguing, among other things, that only PennFIRS reports could be used to show direct exposure to Group 1 carcinogens, citing our decision in *Steele*. *Id.* at 598. We rejected the employer's argument, noting that nothing in Section 301(f) or *Steele* requires the types of carcinogens encountered to be documented with PennFIRS. *Id.* at 601. Rather, we concluded "the only reasonable and practicable interpretation of the PennFIRS reporting requirement in Section 301(f) is to document a volunteer firefighter's presence at a type of fire where firefighters are routinely exposed to Group 1 carcinogens known to cause various types of cancers." *Id.* at 602. We explained that "[s]uch an interpretation gives proper effect to all the provisions in Section 301(f) without imposing a requirement on a volunteer firefighter-claimant that is unreasonable, impracticable and, for all intents and purposes, impossible of execution." *Id.* Because the incident participation reports

detailed the claimant's participation in incidents involving exposure to Group 1 carcinogens, we concluded the claimant met the PennFIRS requirement. *Id.* at 603.

The WCJ and Board, here, determined the report Claimant produced likewise satisfied the PennFIRS requirement, with the WCJ and Board relying on *Bristol Borough* for support. The report introduced in this case has seven columns: first name, last name, telephone number, manual entry by, date, time, and to where responding. (R.R. at 127a-48a.)

In support of this conclusion, the Board quoted the WCJ's Decision, which found as follows:

> 7. In addition to the requirements all firefighters must establish, volunteer firefighters must provide evidence of direct exposure to carcinogens as documented by reports filed pursuant to . . . []PennFIRS[]. *Steele* . . . , 155 A.3d [at] 1173 . . . . Volunteer fire companies are not required to identify and document the specific Group 1 carcinogens encountered at a fire incident in PennFIRS reports for the evidentiary presumption of compensability to apply to their firefighters. Instead[,] the PennFIRS reporting requirement is intended to document a volunteer firefighter's presence at a type of fire where firefighters are routinely exposed to Group 1 carcinogens known to cause various types of cancer. *Bristol Borough* . . . , 206 A.3d 585 . . . . A report detailing a volunteer firefighter's participation in responding to various types of fires that is compiled from the volunteer fire company's PennFIRS reports is sufficient to satisfy the PennFIRS reporting requirement. [*Id.*] Claimant testified that [Employer] reported to the [PennFIRS]. Claimant testified he was able to review the fire reports/summary of fire reports. ([Claimant's Ex.] C-08[, Certified Record at Item 18.])[] Claimant testified that while serving in his leadership position, he was familiar with the way the reports would be submitted to the state through the Penn[FIRS]. Claimant testified that it is a computerized system that the fire company could then pull his summary out. Claimant

23

> testified that based upon his role in leadership (President and Assistant Chief of the Company), the fire reports that he reviewed came from fire reports submitted to the state through PennFIRS. Defendant did not present any evidence to dispute Claimant's testimony in that regard. The report reflects that Claimant responded to various calls with [Employer] from March 7, 2013 to July 4, 2020. (C-08[.])

(Board Op. at 15-16 (quoting FOF ¶ 7).)

We agree with the Board that *Bristol Borough* held that it would be unreasonable to interpret identical language to impose a more difficult reporting standard on volunteer firefighters than is imposed on career firefighters, who are not required to identify and document the carcinogens encountered at every fire. 206 A.3d at 602. *Bristol Borough* also allowed claimants to rely on an incident participation report rather than a PennFIRS report to meet the Section 301(f) requirement. *Id.* at 602-03. As the Board stated,

> Claimant's report documents his responses to numerous calls during his years with [Employer]. While it does not list the type of incidents to which he responded, Claimant credibly testified that he routinely, over the course of his service for [Employer], responded to fire calls, both interior and exterior, at which smoke and soot were present

(Board Op. at 16.) The purpose of Section 301(f) is to document a volunteer firefighter's presence at a type of fire at which he or she would routinely be exposed to Group 1 carcinogens. *Bristol Borough*, 206 A.3d at 602. The incident participation report was provided by Employer, and given Claimant's credible testimony and the WCJ's findings, we agree with the Board that "the purpose of the provision was served." (Board Op. at 16.) Like the Board, we will not disturb the WCJ's determination.

24

*D. Whether the WCJ capriciously disregarded evidence presented by Employer.*

### 1. Parties' Arguments

Employer argues the WCJ capriciously disregarded evidence Employer presented to rebut Dr. Guidotti's opinion regarding HPV as a cause of cancer, specifically, a report by the CDC and an IARC document, (R.R. at 192a, 196a-97a), that, Employer asserts, establishes that HPV16 could, in fact, cause cancer. Because Claimant's tumor was positive for HPV16 and Dr. Goldsmith testified that HPV16 was a leading cause of oral cancers, Employer argues there was evidence that supported the crediting of Dr. Goldsmith's testimony over Dr. Guidotti's contrary opinion. Employer also argues the WCJ erred in not explaining why he found Claimant's testimony regarding Claimant's drinking more credible than a medical record indicating that Claimant was a heavy drinker. Employer maintains that the WCJ's failure to address this evidence was a capricious disregard thereof and that the findings based on Dr. Guidotti's and Claimant's testimony were unsupported by substantial evidence. In so arguing, Employer asserts it is not challenging the WCJ's credibility determinations, as the Board found, but the foundation of the WCJ's factual findings.

Claimant responds that the WCJ's findings are supported by substantial evidence and support the grant of the Claim Petition. Claimant asserts the WCJ rejected Dr. Goldsmith's testimony for numerous reasons, including because Dr. Goldsmith was an epidemiologist, not a medical doctor, and, therefore, was not qualified to make the diagnoses necessary to rebut the firefighter cancer presumptions.

25

2. <u>Analysis</u>

"[A] decision is 'reasoned' for purposes of Section 422(a) [of the Act, 77 P.S. § 834,] if it allows for adequate review by the [Board] without further elucidation and if it allows for adequate review by the appellate courts under applicable review standards. A reasoned decision is no more, and no less." *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transport)*, 828 A.2d 1043, 1052 (Pa. 2003). "Section 422(a) of the Act does not require the WCJ to address all of the evidence presented in a proceeding in her adjudication." *Montgomery Tank Lines v. Workers' Comp. Appeal Board (Humphries)*, 792 A.2d 6, n.10 (Pa. Cmwlth. 2002). "Rather, the WCJ is only required to generally set forth the reasons for making the finding and is only required to make those findings necessary to resolve the issues that were raised by the evidence and which are relevant to making the decision." *Id.*

"Review for capricious disregard of material, competent evidence is an appropriate component of appellate consideration in every case in which such question is properly brought before the court." *Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd. (Marlowe)*, 812 A.2d 478, 487 (Pa. 2002). "A capricious disregard of evidence is a deliberate disregard of competent evidence which one of ordinary intelligence could not possibly have avoided in reaching a result." *Fedchem, LLC v. Workers' Comp. Appeal Bd. (Wescoe)*, 221 A.3d 348, 357 (Pa. Cmwlth. 2019) (citations omitted). "Where there is substantial evidence to support an agency's factual findings, and those findings in turn support the conclusions, it should remain a rare instance in which an appellate court would disturb an adjudication based upon capricious disregard." *Leon E. Wintermyer, Inc.*, 812 A.2d at 487 n.14.

26

Here, Employer offered evidence in an attempt to persuade the WCJ to find Dr. Guidotti's opinions less credible than those of Dr. Goldsmith and to support the latter's opinions. The WCJ provided numerous reasons for finding Dr. Guidotti more credible than Dr. Goldsmith to the extent their testimony differed, most notably that Dr. Goldsmith is not a medical doctor, but an epidemiologist, and that Dr. Goldsmith's review of the records and materials was "suspect." (FOF ¶ 30.) As to Dr. Goldsmith's opinion that HPV16 can cause oral cancers, which was based in part on the materials Employer says the WCJ capriciously disregarded, the WCJ specifically rejected that opinion, finding Dr. Guidotti's opinion as to the interplay between a positive diagnosis for HPV16 and exposure to IARC Group 1 carcinogens more credible. (FOF ¶¶ 23(g), (i)-(j), 25(d), 30(f).) Although Employer asserts the WCJ did not consider its evidence, the WCJ specifically indicated that he "review[ed] and consider[ed] [] the entire evidence of record." (*Id.* ¶ 28.) That the WCJ was not persuaded that discussion of Employer's evidence was necessary to resolve all the essential issues does not mean that the WCJ capriciously disregarded that evidence. *Pistella v. Workmen's Comp. Appeal Bd. (Samson Buick Body Shop)*, 633 A.2d 230, 234 (Pa. Cmwlth. 1993). This is particularly so where the WCJ's findings are supported by substantial evidence. *Leon E. Wintermyer, Inc.*, 812 A.2d at 487 n.14. Indeed, while Employer disclaims that it is challenging the WCJ's credibility findings, it suggests that Dr. Goldsmith should have been found to be credible, and his opinion that it was more likely that Claimant's cancer was caused by HPV16 accepted over those opinions of Dr. Guidotti's. (Employer's Brief at 50-51.) Examining this record and the WCJ's Decision, we are not persuaded that this is one of the rare situations where a WCJ's findings should be rejected based on a

capricious disregard of the evidence. *Leon E. Wintermyer, Inc.*, 812 A.2d at 487 n.14.

As to Employer's contention the WCJ provided insufficient (or no) reason for accepting Claimant's testimony regarding his drinking over a medical document indicating that Claimant was a heavy drinker, we disagree. First, Claimant testified before the WCJ in person, and, as such, the WCJ was permitted to make a demeanor-based credibility determination as to his testimony. *Daniels*, 828 A.2d at 1053-54. Second, the WCJ explained that Claimant's testimony was supported by that of Dr. Guidotti, who discussed Claimant's medical records and why Dr. Goldsmith's contention that Claimant was a heavy drinker was not supported by those records. (FOF ¶ 25(b).) Because the WCJ's Decision does not leave the Court guessing at the WCJ's reasoning and allows for adequate review by this Court, the Decision is reasoned. *Daniels*, 828 A.2d at 1052. "A reasoned decision is no more, and no less." *Id.*

### E. Whether the WCJ made the findings of fact necessary to grant the Claim Petition on all the grounds asserted therein.

#### 1. Parties' Arguments

Employer last argues that the WCJ did not make the findings of fact that were essential to granting the Claim Petition under Sections 301(c)(1), (2), and 108(n) of the Act. According to Employer, the WCJ never specifically found that Claimant's firefighting duties were the actual cause, or a substantial contributing factor, of Claimant's cancer, or that there is a substantially greater incidence of oral cancer in volunteer firefighters than in the general population. Employer contends that the WCJ did not specifically credit Dr. Guidotti's testimony to that effect, nor did the WCJ address the specific burdens of proof for those claims in his conclusions of law.

28

Therefore, Employer asserts, the WCJ's Decision on these points is not reasoned and not supported by substantial evidence.

Claimant argues the WCJ's conclusions in this regard were supported by substantial evidence because the WCJ credited Dr. Guidotti's opinions and IARC documentation. That testimony and documentation reflect that Claimant's firefighting service was a substantial contributing factor in Claimant's cancer as required by Section 301(c)(1), and there is a substantial increase of this type of cancer in firefighters as required by Section 108(n).

2. Analysis

Employer contends that the WCJ did not make any findings that Claimant's firefighting activities were a substantial contributing factor in his cancer or that the incidence of this type of cancer was greater in firefighters than the general population. Upon review of the WCJ's Decision and the record, however, we agree with Claimant that the WCJ made the findings of fact necessary to support the grant of the Claim Petition on these bases. Specifically, the WCJ's summary of Dr. Guidotti's testimony reflects the following:

> h. Dr. Guidotti thoroughly reviewed epidemiologic studies of the incidence of head and neck cancer in the fire service and stated that cancer of the head and neck is a known association with firefighting. Dr. Guidotti **outlined pertinent epidemiological studies to confirm the increased incidence of oral cancer among firefighters**.
> . . . .
> k. Dr. Guidotti opined within a reasonable degree of medical certainty that Claimant's exposure to IARC Group [1] carcinogens as a firefighter **are substantial contributing factors in the cause of his oral cancer** . . . . Dr. Guidotti opined that given Claimant's long firefighter service and exposure to IARC Group [1] carcinogens in smoke, soot, diesel emissions, and asbestos, it was a substantial contributing factor to Claimant's diagnosis.
> . . . .

29

e. Dr. Guidotti continued to assert, within a reasonable degree of medical certainty that **Claimant's fire service was a significant contributing factor in his diagnosis with head and neck cancer**.

(FOF ¶¶ 23(h), (k), 25(e) (emphasis added).) The WCJ found "the opinions of Dr. Guidotti more credible than the testimony of [Dr.] Goldsmith to the extent their testimony is inconsistent," citing Dr. Guidotti's status as a highly credentialed medical doctor with numerous certifications. (*Id.* ¶ 29.) While the WCJ then identified certain portions of Dr. Guidotti's testimony, we do not view this as a rejection of Dr. Guidotti's testimony that was otherwise summarized by the WCJ earlier in the Decision. That credited testimony, as summarized by the WCJ, specifically provides the findings of fact that Employer claims are needed to support the WCJ's grant of the Claim Petition. Accordingly, we are not persuaded by Employer's arguments that we must reverse the WCJ's Decision in this regard.

## III.    CONCLUSION

For the foregoing reasons, we hold the WCJ and Board did not err in concluding Claimant timely gave notice of his claim to Employer or in finding Claimant's participation report sufficient to meet the Section 301(f) requirements. Additionally, we conclude the WCJ did not capriciously disregard evidence, and his decision was reasoned and contained the findings of fact necessary to support the grant of the Claim Petition. We therefore affirm.

RENÉE COHN JUBELIRER, President Judge

Judge Dumas did not participate in this decision.

30

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lake Ariel Volunteer Fire Company,    :
                             Petitioner    :
                                        :
                        v.              :    No. 92 C.D. 2024
                                        :
Alex Rae (Workers' Compensation    :
Appeal Board),                      :
                       Respondent    :

# **O R D E R**

**NOW**, April 1, 2025, the Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is **AFFIRMED**.

_____
RENÉE COHN JUBELIRER, President Judge